# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 1, 2011 Session

## GERALD LEE POWERS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P27411      Carolyn Wade Blackett, Judge**

---

**No. W2009-01068-CCA-R3-PD  - Filed February 22, 2012**

---

The petitioner, Gerald Lee Powers, appeals the judgment of the Shelby County Criminal Court denying his petition for post-conviction relief.  In 1998, he was convicted of first degree felony murder and aggravated robbery.  His convictions and death sentence were affirmed on direct appeal by the Tennessee Supreme Court. See State v. Powers, 101 S.W.3d 383, 387 (Tenn. 2003), cert. denied, 538 U.S. 1038, 123 S. Ct. 2083 (2003).  On appeal, the petitioner presents a number of issues:  trial counsel were ineffective in selection of jurors; the trial court erred in not allowing individual voir dire and limiting counsel's voir dire questioning; trial counsel were ineffective because they had excessive caseloads and did not object to long trial days; trial counsel failed to investigate certain evidence; trial counsel were ineffective as to expert witnesses; trial counsel were ineffective in presentation of other suspects to the homicide; trial counsel were ineffective in their witness interviews and failed to locate certain relevant witnesses; the trial court erred in instructing the jury as to reasonable doubt; the State failed to produce exculpatory evidence and to preserve certain evidence; the trial court should have disqualified itself; trial counsel failed to object to the applicability of Tennessee Code Annotated section 39-13-204(c); and imposition of the death penalty is unconstitutional.  We have carefully reviewed each of these claims and conclude, as did the post-conviction court, that they are without merit.  Accordingly, we affirm the order of that court denying the petition for post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Donald E. Dawson, Joanne L. Diamond, and Kertyssa Austin, Office of the Post-Conviction Defender, Nashville, Tennessee, for the appellant, Gerald Lee Powers.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General;

Angele M. Gregory, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The proof, as set out in our supreme court's decision, established the following:

On April 18, 1996, the victim, Shannon Sanderson, spent the evening gambling at Sam's Town Hotel and Gambling Hall in Tunica, Mississippi. She originally planned to spend her evening at the casino with her husband, Robert Sanderson, to celebrate his birthday. However, an argument occurred between the couple. After leaving her children with their paternal grandparents at approximately 6:30 p.m., Mrs. Sanderson departed for Tunica alone.

Shannon Sanderson played blackjack most of the night and won $5,000. She cashed in her chips shortly after 3:00 a.m. on April 19, 1996, receiving her winnings in one-hundred dollar bills. She was then escorted to her car by a Sam's Town security officer and began the fifty-six mile drive back to Memphis to pick up her children.

At around 4:45 a.m., Shannon Sanderson's former father-in-law, Edward Holland, awoke to the sound of barking dogs. He looked outside and saw Mrs. Sanderson bending over beside her car. He heard her say, "Don't–don't" and thought she was talking to her husband. By the time Mr. Holland dressed and went outside, Mrs. Sanderson was gone, but her car remained in the driveway.

At the same time, the Hollands' next-door neighbors, William and Anna Dillon, were also awakened by the barking. Mr. Dillon looked out his window and saw a person wearing a red baseball cap crouched in the Hollands' driveway near Mrs. Sanderson's car. Mrs. Dillon heard a scream and a thud. When she looked out her living room window, she saw a car parked at the curb with its dome light on. She saw a person behind the steering wheel of the car lean over the seat and push something down in the back. The person then drove away at a high rate of speed.

Another neighbor, Johnnie Rose, was returning from work around 4:30 a.m. when he saw Mrs. Sanderson's car drive by his house. A second vehicle followed her. The vehicle was dark-colored and shaped like a Chevrolet Beretta. He watched the second car turn down his street, turn around in a driveway, and park in front of the Hollands' house. When he was later shown a photograph of the maroon Beretta owned by Powers' wife, he stated that the car in the photograph "looked like" the car he had seen following Mrs. Sanderson.

At approximately 6:40 a.m. on April 19, 1996, Alonzo Jeans, a school bus driver, was heading north on Highway 301 near Eudora, Mississippi. He saw a white male backing into the driveway of an abandoned house. In the ten years he had been driving this bus route, he had never seen anyone coming from or going to that house. Mr. Jeans was later shown a photograph of the maroon Beretta owned by Powers' wife. He confirmed that the car in the photograph was the one he had seen in the driveway.

At approximately 9:30 a.m. on April 19, 1996, Powers returned to his Clarksdale, Mississippi home in his wife's maroon Beretta, after a night of gambling in Tunica. He was wearing the same yellow shirt, blue jeans, red baseball cap, blue denim jacket, and white tennis shoes that he had worn the night before. According to his wife, Sharon Powers, he was in a good mood, but he was also "kind of wired up." He appeared nervous and kept looking out the blinds. Powers told his wife that he had won a large amount of money at the casino and gave her a one-hundred dollar bill from the stack he had in his wallet. Mrs. Powers also noticed that her husband had washed her car and had cleaned and vacuumed its interior.

Mrs. Powers became suspicious and accused her husband of having an affair. After repeated questioning, Powers confessed to kidnapping, robbing, and killing a woman he had seen playing blackjack at Sam's Town the night before. He described in specific detail how he watched the woman play blackjack from the second floor balcony of the casino, followed her home, and abducted her from her driveway. He drove her approximately forty miles to an abandoned house in Mississippi, stopping at one point to move her from the back seat of the car to the trunk. He then stole her jewelry as well as $5,000 in cash. After killing the woman, he threw her purse and his gun into the river behind the site where the Splash Casino had been located. Powers also told his wife that a school bus driver may have seen him at the abandoned house and that a neighbor may have seen him take Mrs. Sanderson from her driveway.

He did not believe that either person could identify him.

That afternoon, Powers visited his neighbor, Margaret York, and asked her to provide him with an alibi for the night of April 18, 1996. Laughing, Ms. York agreed to say that he had been with her as long as he "didn't kill anybody." According to Ms. York, Powers' expression did not change when she made this remark, and he left shortly thereafter.

The next evening, Powers and his wife saw a television news report of the victim's abduction. The report described the perpetrator as a man wearing a red baseball cap and driving a maroon Beretta. After hearing the report, Powers packed a bag and left home in his wife's car. Before leaving, he told his wife to tell anyone who asked that he was visiting his mother in Murfreesboro, Tennessee. He also told his wife that there was some money buried in the backyard. Soon after he left, Mrs. Powers called the police and told them that her husband may have been involved in Mrs. Sanderson's abduction. However, she did not inform the authorities about his confession.

Powers returned a week later. He retrieved some of the money he had buried and told his wife where he had hidden Mrs. Sanderson's jewelry. As his wife watched, he wrote a note stating that he was leaving because he was not happy with his marriage.

On May 9, 1996, the badly decomposed body of Shannon Sanderson was discovered in a storage room at the back of the abandoned house on Highway 301 in Eudora, Mississippi. The body was clad in the same clothing Mrs. Sanderson had been wearing the night she disappeared. Her jewelry was missing. An autopsy disclosed that Mrs. Sanderson had died from a single gunshot wound to the right side of the head. An examination of the skull revealed that she had also suffered at least one major blow to her face that had knocked out her upper right front tooth, chipped another tooth, and fractured her jaw and other facial bones.

On May 22, 1996, Powers was stopped by an Immigration and Naturalization Services ("INS") agent in Hebronville, Texas, after making a suspicious turn in an apparent attempt to avoid a checkpoint. When ordered to step out of the vehicle, Powers pulled a knife on the agent. The agent was able to subdue Powers. Upon arrest, the agent discovered fourteen one-hundred dollar bills in Powers' pockets. Powers was on parole for a prior offense at the time of his arrest.

The Federal Bureau of Investigation ("FBI") secured the vehicle at the checkpoint and learned that Sharon Powers was its registered owner. With Mrs. Powers' consent, the FBI searched the Beretta and found a black wool fiber in the back seat that was consistent with the victim's clothing. Subsequently, the FBI interviewed Mrs. Powers. She eventually informed investigators of her husband's confession and led them to the B & W Lounge where Mrs. Sanderson's jewelry was recovered. The jewelry was wrapped in pink plastic wrap that matched wrap from Powers' home. Officers also searched the Splash Casino site, but they did not find Mrs. Sanderson's purse or the murder weapon.

The State also introduced video clips chronologically compiled from Sam's Town surveillance cameras operating on the night and early morning hours of April 18-19, 1996. The videotape showed a person wearing white tennis shoes standing in an area overlooking the blackjack table where Mrs. Sanderson was gambling. The tape then recorded Mrs. Sanderson leaving the casino. The person from the second floor balcony followed her approximately thirty seconds later.

Powers called only one witness, Rebecca Coradini, who lived near the Holland residence. Ms. Coradini testified that she was standing on her front porch shortly after 4:00 a.m. on April 19, 1996, when she saw a van drive by, turn around, and come back. She then saw Mrs. Sanderson's car drive by, followed by a little maroon car driven by an older Caucasian man, who resembled the victim's husband. Ms. Coradini had seen Mr. Sanderson on television following the abduction.

At the conclusion of the evidence, the jury convicted Powers of aggravated robbery and first degree felony murder in the perpetration of robbery. During the sentencing phase of the trial, the State sought to prove three aggravating circumstances: 1) the defendant had been previously convicted of one or more felonies wherein the statutory elements involve the use of violence to the person; 2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution; and 3) the murder was knowingly committed, solicited, directed, or aided by the defendant while he was committing, attempting to commit, or fleeing after having committed a kidnapping. See Tenn. Code Ann. § 39-13-204(i)(2), (6), and (7) (Supp. 1996).

The State presented, over defense counsel's objection, facts relating to

Powers' prior felony convictions. First, Emily Dodson testified that in 1979, in Rutherford County, Tennessee, Powers followed her home one night. As she was getting out of the car, Powers jumped into the car and held a knife to her throat. They struggled, and Powers hit her with a crescent wrench. Ms. Dodson, however, successfully escaped to her house. Powers was apprehended shortly thereafter, and Ms. Dodson identified him as her attacker. Powers subsequently pleaded guilty to the aggravated assault of Ms. Dodson.

Karen Cannon then testified that in October 1980, in Murfreesboro, Tennessee, she was giving Powers a ride when he pulled a knife and broke her nose with the handle. Despite being held at knifepoint, Ms. Cannon managed to drive to the county jail where she alerted the authorities to her predicament by honking the horn. Powers was apprehended, and Ms. Cannon later identified him as her assailant. Powers subsequently pleaded guilty to the aggravated assault of Ms. Cannon.

The State next introduced testimony of Captain Sammy Magee, an officer with the Sheriff's Office of Hinds County, Mississippi. Captain Magee testified about his investigation of Powers' robbery and aggravated assault of Clyo Griffin in June 1984. According to Captain Magee, Powers entered Ms. Griffin's home, beat her with an iron skillet, and stole her jewelry, credit cards, and a pistol. Powers hid the jewelry and pistol in a plastic bag and buried them. He later pleaded guilty to robbery and aggravated assault of Ms. Griffin.

The State also introduced a copy of the judgment reflecting Powers' guilty plea and conviction for assault with a dangerous weapon on the INS agent in Hebronville, Texas, in May 1996.

Finally, the State introduced the victim impact testimony of Caroline Holland, the paternal grandmother of Shannon Sanderson's three children. Ms. Holland testified that the death of Mrs. Sanderson had been very traumatic for the children and that they suffered a "devastating feeling of terror" that people would get lost and never come back. She also stated that the children had trouble sleeping and missed their mother every day.

The only witness for the defense was Powers' first wife, Pamela Bigelow, who had married him while they were seniors in high school in Murfreesboro, Tennessee. Ms. Bigelow related that Powers came to the United States from Taiwan when he was ten years old. Powers' mother was a native of Taiwan. His stepfather was a resident of Murfreesboro, Tennessee,

who had met Powers' mother while stationed with the military in Taiwan. According to Ms. Bigelow, Powers was a good student and athlete, but he had trouble communicating with his mother. Ms. Bigelow and Powers were married for four years and had two children. She divorced Powers because she "outgrew him," but she stated that Powers possessed "good traits." She described Powers as quiet and withdrawn, but very polite. She testified that Powers had never been physically or emotionally abusive to her. She admitted, however, that he had used drugs and alcohol while they were married. She described Powers as a "broken man" and pleaded for his life so that he could meet his two grandchildren.

Based on this proof, the jury found that the State had proven all three aggravating circumstances beyond a reasonable doubt. In addition, the jury found that the State had proven that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. As a result, the jury sentenced Powers to death for the murder of Shannon Sanderson.

Powers, 101 S.W.3d at 387-91.

On June 11, 2003, the petitioner filed a *pro se* petition for post-conviction relief, and, following the appointment of counsel, an amended petition was filed on March 18, 2004. Counsel subsequently filed a consolidated petition for post-conviction relief on January 5, 2009, the day the evidentiary hearing commenced. Following a three-day hearing on a portion of the proof, the matter was continued until February 9, 2009. Counsel filed a motion to disqualify the post-conviction judge, alleging that she had been inattentive at the January hearing and had expressed bias and hostility. The post-conviction court denied the motion, and the petitioner sought permission to appeal the ruling pursuant to Tennessee Rule of Appellate Procedure 9. The post-conviction court denied that motion, and the evidentiary hearing proceeded. The petitioner then filed an application for permission for an extraordinary appeal pursuant to Tennessee Rule of Appellate Procedure 10, which this court denied on March 20, 2009. On April 28, 2009, the post-conviction court entered its findings of fact and conclusions of law, denying the petition for post-conviction relief.

At the post-conviction hearing, lead counsel testified that he had been practicing law since 1976 and had been employed by the public defender's office since 1995. At the time of the petitioner's trial, he was a part-time assistant public defender assigned solely to homicide cases and had a private practice. Counsel said he had handled "many" capital cases and had attended capital case seminars during his employment with the public defender's office. His responsibilities as lead counsel on the petitioner's case included making decisions about the course of the investigation and assigning specific roles to the other members of the

defense team: co-counsel; Ralph Nally, the fact investigator; and Elizabeth Benson, the social investigator. He estimated that his case load with the public defender's office varied between five and ten lead counsel cases and "a similar number" of cases as co-counsel. He acknowledged that his case load at the time was greater than the standards recommended by the American Bar Association and that it "probably" prevented him from doing some of the work he would liked to have done in the petitioner's case. Lead counsel said that the State provided him with "something [akin]" to open file discovery at the guilt/innocence phase and that he was allowed to take notes of the State's file. Counsel met with the petitioner "[m]any, many times" to discuss the discovery and investigation of his case. Counsel also sought expert assistance regarding the proof of the fiber and plastics and consulted an expert regarding the FBI lab report indicating that the fiber found in the petitioner's car matched the victim's clothing. He acknowledged that the expert was not in the courtroom to assist him with his cross-examination of the State's witness.

Lead counsel said that the most difficult fact to overcome in the petitioner's case was the testimony of his wife, Sharon Powers. Counsel requested an expert for the marital privilege hearing to try to exclude Sharon's[1] testimony, but his motion was denied. Counsel did not want Sharon to testify because the petitioner had confessed to her and had given her some money the night of the victim's murder. He recalled that, on the night before Sharon was to testify, the prosecutor gave him surveillance tape recordings made at Margaret York's house but advised that the tapes were inaudible. However, when counsel listened to the tapes that night, he heard voices and requested a continuance the next morning to allow time to transcribe the tapes, but the court denied his request. Counsel had the tapes transcribed but did not receive the transcript until after Sharon had testified. When counsel listened to the tapes before the post-conviction hearing, he heard Sharon say that the petitioner "said he didn't do it" although that portion of the tape had been marked inaudible in the transcript. Counsel said he could have cross-examined Sharon about the statement had the tape been transcribed correctly and been available. The tapes also were not available at the time he took Ms. York's deposition.

Lead counsel said that he knew the petitioner was biracial, that the petitioner's mother was Taiwanese, that the petitioner had lived in Taiwan for about ten years, and that the petitioner never knew his biological father. Counsel said it might have been appropriate to consult an expert who knew about the challenges facing a biracial child in Taiwan. He acknowledged that the petitioner's first wife, Pamela Bigelow, was his only witness at sentencing. According to Bigelow, the petitioner had a poor relationship with his mother. Counsel said he had "a great deal of difficulty" contacting the petitioner's mother, and she

[1]Because several of the witnesses share the same last name as the petitioner, we have chosen to refer to them by their first names to avoid confusion. We intend no disrespect in doing so.

elected not to testify even after the defense obtained transportation for her. The petitioner reported that his stepfather's address was unknown. Counsel said he requested eighteen mitigation factors, but the court did not give all of them. Counsel agreed that it might have been beneficial to have had an expert testify regarding the petitioner's low self-esteem and personality inadequacy. He said that the defense team did not investigate the petitioner's background in Taiwan because of the distance and cost involved, explaining that they had "enough to concentrate on with the things that [they] could investigate here." Counsel said that the petitioner did not report any alcohol usage during the time he lived in Taiwan. The defense team did not have any information about gambling problems among the members of the petitioner's maternal family or about the petitioner's being raised by his grandmother.

Lead counsel said he was unaware at the time of trial that one of the State's witnesses, Anna Dillon, had been placed under hypnosis in an attempt to get additional details about what she had witnessed on the morning of April 19, 1996. Counsel also was unaware that a videotape existed. Had he known about the hypnosis, counsel would have moved to exclude Dillon as a witness and would have cross-examined her about the discrepancies in her description of the assailant's car and physical appearance.

Lead counsel said that at the time of the petitioner's trial in 1998 he only asked for juror questionnaires in extraordinary cases and could not recall using them prior to that time. Counsel said he did not remember the voir dire in the petitioner's trial. Asked if he incorporated the Colorado method into his voir dire in 1998, counsel replied, "Not the Colorado method in full, of course, but maybe some aspects of it." Counsel explained the method that most of the courts used at the time was "a sheet which ha[d] each of the juror[']s positions on it and on each position [counsel would] take a post-it note and put it on top of that position and have that juror's information on the post-it note so that when that juror's replaced [counsel could] simply substitute the notes." He acknowledged that not all of the defense challenges were used. Counsel filed a motion for individual voir dire, but it was denied. He recalled that several jurors indicated they had heard, read, or seen news footage about the petitioner's case, but he did not renew his motion for individual voir dire because he did not "feel that the information that [counsel] had gotten . . . called for it." He said that the petitioner had input on the jury selection and that if the petitioner had requested him to strike a juror he would have done so.

As to the juror who had an uncle who had been missing for several months, lead counsel recalled that the juror said he could put that fact aside and not let it affect him. Counsel testified that it was not uncommon to have jurors who had been the victim of a crime themselves or had relatives who had been a victim. As to whether the trial judge allowed the jurors to take breaks or break for the night if they needed to, counsel said, "My experience with [the trial judge] is that he would always ask in situations like that." He said if the jury

had objected to working until 10:00 p.m., they would not have done so.

Lead counsel said that, during an investigative interview, Brian Maher reported that the victim told him, a short time prior to her death, that she had grown tired of her marriage and wanted a divorce. However, the court excluded Maher's testimony at trial. Counsel attempted to cross-examine the victim's husband, who denied any marital problems, about Maher's statement, but the court did not allow the questioning.

On cross-examination, lead counsel agreed that the petitioner's case presented a "tough factual situation" because the petitioner had confessed to his wife who led the police to where the victim's jewelry was hidden. Further, the petitioner was arrested in Texas and assaulted a federal officer near the border. A witness also saw a vehicle matching the description of the vehicle the petitioner drove coming out of the driveway of an abandoned house in Eudora, Mississippi, where the victim's body was found. Throughout counsel's representation of the petitioner, the petitioner denied any involvement in the victim's murder. Accordingly, counsel pursued the defense that a third party had committed the murder. Counsel said there were several people he wanted the jury to focus on as the potential killer. However, the trial court determined that the proof was insufficient to present to the jury.

Lead counsel said that during the petitioner's intake evaluation, the petitioner indicated that he had a gambling problem and had "abused substances." The petitioner said "[n]othing" about his family other than he did not know his biological father. The defense team specifically asked the petitioner about past trauma or abuse, and the petitioner denied any. Counsel said he "[c]ertainly" would have hired a psychological expert had he detected that the petitioner had addiction or memory problems. Based on the defense team's conversations with the petitioner and the petitioner's mother, counsel did not see a need to go to Taiwan to interview other family members. The petitioner made good grades in school, ran track in high school, and had plans to attend college until his girlfriend became pregnant. Because the petitioner performed well in school, counsel believed there would have been "a very real possibility" of contradiction had he tried to show that the petitioner was deprived and victimized because of his cultural background. Counsel opined that such a contradiction could have caused him to "quickly" lose credibility with the jury.

Lead counsel said the petitioner chose not to testify at both phases of the trial. As to the penalty phase, lead counsel said that the defense had no statutory mitigating circumstances in the petitioner's case and that they relied upon nonstatutory mitigation. He said that the aggravating factors against the petitioner were quite compelling, "[e]specially the aggravated assault, the three female victims, at separate times that he had been convicted of. Very compelling and their testimony was especially compelling."

Co-counsel testified that she formerly was the supervisor of the capital defense team for the public defender's office and was assigned to the petitioner's case. Her role was to assist the lead attorney and follow his direction. Co-counsel said she never had any problems with the petitioner and felt they had a good relationship. She said that the petitioner's case was "quite a bit different" in that multiple agencies and multi-state issues were involved and that the case "was indicted once [her office] received it. It did not come through the General Sessions Court[]." As a result, her office did not have the 90- to 180-day leeway of preparation that it normally had prior to an indictment.

Co-counsel said she knew that the petitioner was born in Taiwan in 1954 and came to the United States when he was ten years old. The petitioner reported that he underwent alcohol and drug treatment while incarcerated at Parchman Prison, but he did not report any substance abuse problems. Co-counsel described the petitioner as "a man of few words" and "a very closed person." Co-counsel did not develop the issue of the petitioner's origin because there was no indication that anything occurred prior to his coming to the United States that would have affected the case. She said that the location of the petitioner's stepfather was unknown and that the petitioner had not seen his mother since 1995. Co-counsel did not meet with the petitioner's mother. She said that the petitioner had no history of mental illness but of depression and "feeling trapped in life." She had represented other clients who were of Asian descent and was aware of difficulties they had, but the petitioner did not bring any problems of that nature to her attention. Co-counsel said that the issues pertaining to the petitioner were "more stronger legal issues, more so than social history issues" and that there was "no way for [counsel] to assume, because [the petitioner] is of a certain ethnic, racial, or social history that certain issues exist." The defense team knew that the petitioner frequented the casinos, but the idea that he was a compulsive gambler, in the issue of mitigation, would not have been "outweighed by the fact that he killed somebody at the casino who had won a lot of money."

Co-counsel acknowledged that testimony from a psychiatrist or psychologist would have been helpful for some of the mitigating factors. Co-counsel said that the aggravating factors were of "great concern":

> The factual allegations of the case were overwhelming. The scientific evidence in the matter was very concrete and fast. The hope was not to get to penalty. To get to penalty in this case was to lose this case.
>
> [The petitioner] was not mentally ill. There were only superficial, or perfunctory issues dealing with mitigation that we could present. The allegations . . . pertaining to the other instances of violence as it pertained to women did not vote well of the factual allegations of this instance. It sounded

as if he were a predator and that's how it was portrayed.

Co-counsel recalled using the phrase, "What do we know about [the petitioner]? He's a small, short, [O]riental man," in closing argument. She explained that she did so for "jury nullification," to implant in the minds of the jurors that the petitioner may not have been the person who committed the offense since the videotape from the casino did not depict the height of the individual, who could have been up to six feet tall, while the petitioner was only about five feet, four inches tall.

As to jury selection, co-counsel could not recall whether a juror, whose uncle was missing in Mississippi and presumed murdered, was impaneled but agreed it was true if reflected in the transcript.

On cross-examination, co-counsel reiterated that the petitioner did not report any substance abuse problem. Asked about the section on the petitioner's federal records indicating that he had reported "drinking no more than a six pack of beer, per week . . . experimenting with cocaine about ten years ago and smoking marijuana on a social basis whenever friends offered him marijuana," co-counsel said that would have been in "direct opposition" to a claim that the petitioner was a drug addict. As to why co-counsel did not request funds to investigate the petitioner's Taiwanese descent, counsel said, "It is not the asking, it's the granting that would have been the issue. But, there was no indication that there was a great need for that to be asked, there was no self reporting."

Co-counsel said that the factual allegations surrounding the petitioner's case were "bad facts" and that it would have been difficult to ask the jury to "take mercy and pity on [the petitioner], even though he did all of this and . . . there's proof he did all of this . . . . It's a big mouthful to say if you don't have the building blocks to stand on. And that's the problem with [the petitioner's] mitigation." Co-counsel explained that the problem with the petitioner's case was that there was no self-reporting to adequately develop the mitigation. The petitioner made good grades in school, and his "history as far as his assimilation" after coming to the United States "was like the American dream." Co-counsel said that the petitioner chose not to testify.

William Pearce, a retired supervisor for the North Carolina Bureau of Investigation Crime Laboratory Trace Evidence Unit, testified that he was asked by post-conviction counsel to evaluate the examinations performed by the Federal Bureau of Investigation ("FBI") Laboratory. He said he was unable to fully evaluate what was done by the FBI laboratory without seeing the lab notes, explaining that what the FBI analyst did in his analysis was best reflected in his lab notes. He said that the trial testimony of Special Agent Christopher Hopkins indicated that some of the work was done under his supervision,

meaning that work may have been done by other agents and additional lab notes may have been generated by those agents. Pearce said that he needed the lab notes in order to assess whether the agent performed an ultraviolet micro-spectrophotometer test on the black fiber analyzed in the case.

Pearce said that, after he received the lab notes, he reviewed the examinations conducted by Agent Hopkins. Hopkins' report reflected that a black wool fiber consistent with the victim's clothing was found on the tape lift from the petitioner's car. He said that the fiber could have remained in the petitioner's car for an extended period of time if it was left undisturbed. Pearce was unable to determine what Agent Hopkins meant in his lab notes when he used the reference "dyed completely through" when referring to the wool fiber. Regarding the fiber sample, Pearce said that if he had been consulted by the defense at trial, he would have advised counsel that Agent Hopkins needed "to rectify the difference between his conclusion and his report, which is inconsistent, to a statement which says that they are consistent to the point that they're consistent in many, many, many haystacks. That in my mind is an identification." On cross-examination, Pearce agreed that his problem with Agent Hopkins' testimony was that "he went to a higher level of certainty when he testified than what was reflected in the report."

Mark McDaniel, general counsel for Brewer Detective Agency, testified that the agency investigated the victim's disappearance and murder on behalf of Robert Sanderson, the victim's husband. He said that, after an exhaustive search, the agency was unable to locate the file on the case, explaining that the agency's policy was to destroy files after five years.

Jessica Peevy, a legal assistant with the Post-Conviction Defender's Office, testified that she transcribed a video recording of a hypnosis. She said that portions of the VHS videotape were inaudible, and a DVD was prepared from the tape. Peevy said that, after listening to both the videotape and the DVD, the DVD appeared to be an accurate reproduction of the videotape and that the inaudible portion was a five-minute segment at the beginning of the videotape.

Dr. Murray Smith, a specialist in internal medicine and addiction medicine, testified that he evaluated the petitioner on two occasions, in November 2004 and December 2008. When he saw the petitioner in December 2008, there was "a very marked change in his mood" and he appeared significantly depressed. Dr. Smith also reviewed extensive records on the petitioner, including an evaluation performed at Parchman Prison in Mississippi in 1985 and a psychological intake screening performed at Terre Haute Federal Prison in 1997. He said that the Parchman Prison report reflected that the petitioner had an extensive history of substance abuse and needed help for psychological symptoms. The federal prison report

indicated that the petitioner had a history of "poly-substance abuse," meaning many substances, and that the petitioner was not interested in receiving treatment. He agreed that poly-substance abuse was common for addicts who were attempting to be "their own doctor trying to make themselves feel better . . . and prescribing something to make them feel less anxious, less angry, less put down." Dr. Smith also reviewed the petitioner's evaluation dated July 13, 1999, from the Riverbend Maximum Security Institution, which reflected an elevated chemical abuse scale.

Dr. Smith said he had a "round table discussion" with Drs. Cheng, Copper, and Kenner, all of whom had information from their evaluations of the petitioner and his family history. Dr. Smith learned that several of the petitioner's uncles had problems with drinking and gambling and that one uncle had given the petitioner beer when he was seven or eight years old. He said that the petitioner, who had a "mixed racial background," came from Taiwan to the United States when he was about ten years old. The petitioner began using alcohol and marijuana intermittently at age fourteen and then progressed to "excessive, beyond the average" usage. The petitioner told Dr. Smith that he had also used methamphetamine and cocaine intravenously and had been exposed to solvents while working at two factories. The petitioner drank alcohol to the extent that he had "black-outs, alcohol induced amnesia." Dr. Smith said that the petitioner's first wife, Pamela Bigelow, reported that the petitioner hid his drug use from her because of her strict religious background and that his drug and alcohol lifestyle caused the termination of their marriage.

Dr. Smith said that the petitioner also had a gambling addiction and that in 1994 when the petitioner could no longer work because of back trouble, gambling became his occupation. He said that a standard day for the petitioner consisted of spending many hours at the casinos in Tunica, Mississippi, and then using alcohol and marijuana. Dr. Smith opined that the petitioner's addictions stemmed from losing his mother, who left the family to go to work in Tai Pei, and from being separated from his maternal grandmother, who raised him for the first six to eight years, when he was brought to the United States. Those losses resulted in the petitioner's need "to have a female intimately in his life" and his self-medicating with drugs and alcohol when stressed. The petitioner had been married four times and had an extramarital affair. Dr. Smith opined that the petitioner had a fear of loss, "which kept him constantly on guard and anxious that he would l[o]se another woman, he'd l[o]se another mother."

Dr. Smith said that the petitioner had an increased sensitivity to alcohol due to his genetic background, explaining that the "genetic brain chemistry for addiction and the metabolism are both involved." Dr. Smith learned from the experts who reviewed the petitioner's family history and from his first wife that the petitioner was "short tempered. He had a short fuse. He was easy to go into a rage." As a child, the petitioner did not feel

-14-

he belonged in Taiwan or in the United States, and he never overcame that feeling. The petitioner felt he was discriminated against, especially in middle school and high school. Dr. Smith opined that as a result of feeling angry and isolated, the petitioner tried to "numb" those feelings with drugs and alcohol.

On cross-examination,[2] Dr. Smith testified that the petitioner's position was that gambling was "his work" and he did not drink or use drugs while "working [because] he wanted to focus and concentrate on what he considered his occupation." The petitioner denied drinking or using drugs while at the casino the night of the murder and reported that his alcohol use had decreased from 1992 to 1996. The petitioner refused to talk to Dr. Smith about the offenses with which he was charged or any other criminal activity in which he had been involved. Dr. Smith said he classified the petitioner as a gambling addict based on the petitioner's continuing to frequent the casinos even though he was "not doing very well at it."

The State's lead counsel testified that she was one of the prosecutors on the petitioner's case. She said that her office was provided with some boxes of evidence from the FBI, but she did not recall if those boxes were received in August 1998. She did not know what happened to the evidence after trial but said that the trial file would have gone to the closed file and then to storage. She remembered that Sharon Powers had wanted her diary back but did not know if it was returned to her.

Melinda Patillo, a civilian supervisor for the Memphis Police Department Property and Evidence Room, testified that she had worked in the property and evidence room since 1998. She said that some of the evidence requested by the defense had not been located, including a comforter, a Rohm handgun, hair samples, a spent .25 caliber bullet, a cloth seat sample, carpet, an assorted round, a clip, miscellaneous holsters, towels, a mattress cover, a blanket, a plastic cap with hair, a plastic bag, a blood sample from a rear bumper, miscellaneous residue, a "Horseshoe brand" hat, miscellaneous truck scraping, a letter, brochures, a pen, a pillow and case, a piece of a truck lining, a Colt handgun, a Browning handgun, three packages of photographs, and a Motorola cellular telephone. She explained that a federal investigation of the property and evidence room resulted in the closure of the room "for a while," and some items were moved to another location. The department had experienced problems locating evidence in other cases prior to 2004. Other law enforcement agencies, including the FBI, were involved in the petitioner's case, and some of the evidence was located with those agencies.

---

[2]Because Dr. Smith did not have his case file with him, his cross-examination testimony was continued until February 9, 2009.

Wanda Getz testified that her brother, Ronnie Powers, met the petitioner's mother, Cindy, when he was in the military and stationed in Taiwan. She said that Ronnie brought Cindy and the petitioner to the United States when he returned from Taiwan and that they lived with her for a short time. She described Cindy as a hard worker who went "overboard" with her cleaning. Getz said that Cindy spoke "broken English" and that the petitioner spoke better English than his mother. She recalled "some sort of squabble" that the petitioner had with her son, Terry. She said that Ronnie and Cindy had been divorced for several years.

James Ronald Powers testified that he was known as "Ronnie" to his family and was formerly married to the petitioner's mother, Cindy. He said that he joined the United States Army in 1962 at the age of eighteen and was stationed in Taiwan for two years. He met Cindy in Taipei where she was working as a "bar girl." He said he paid Cindy indirectly for their sexual relationship, explaining that he bought cigarettes and beer from the PX every week and gave them to Cindy who then sold them on the black market to earn a living for her family. He had known Cindy for about a year before he met the petitioner, and Cindy initially told him that the petitioner was her nephew. He saw the petitioner with Cindy's mother in Taipei on two or three occasions, and they appeared to be "very close" while Cindy was a "little more distant, not as affectionate . . . [b]ut protective" toward the petitioner. Ronnie subsequently married Cindy, and as they were leaving Taiwan for the United States, Cindy told him that the petitioner was her son and that he had to come with them. Ronnie explained that in order for the petitioner to accompany them to the United States, he had to imply that by marrying the petitioner's mother he was going to adopt the petitioner. However, he never formally adopted the petitioner.

Ronnie said that when they arrived in the United States, they lived in his mother's house in Murfreesboro, along with his two sisters and two nephews, for a little less than a year before renting their own home. He described the interaction between them and his family as "quite awkward at first and there was some resentment." One of his nephews, Terry Getz, was about the same age as the petitioner, and he and the petitioner "had a couple of run-ins." At first, the petitioner could only speak "a couple of words" of English and often became frustrated because of his inability to communicate. Ronnie enrolled the petitioner in the fifth grade and, within two years, the petitioner became fluent in English and did very well. The petitioner experienced some "little scuffles" at school, and his teacher reported that the other children were picking on the petitioner. Ronnie assumed that the petitioner had problems because of his race, but he did not witness any.

Ronnie said that Cindy's ability to speak English improved only slightly, and she constantly had difficulty understanding English. Shortly before he married Cindy, Cindy told him that she was twenty-seven years old and that the petitioner was ten years old. Cindy told him that the petitioner's father was "an American G.I." who was supposed to return for her

and the petitioner, but his plane crashed. Ronnie said that his marriage to Cindy lacked affection. Because he and the petitioner were only ten years apart in age, their relationship was more like a friendship than a father/son relationship. The petitioner was a good athlete and participated in track and field events in school. Ronnie did not recall attending the petitioner's high school graduation and did not believe Cindy attended either.

Ronnie said that the petitioner began dating his first wife when they were in the tenth or eleventh grade and that they got married their senior year. To his knowledge, the petitioner did not drink or use drugs in high school, but he suspected "there was some beer drinking going on" when the petitioner talked about going camping at a state park. He warned the petitioner that it was illegal to have beer in a state park. Ronnie said that Cindy was the disciplinarian and sometimes spanked the petitioner with a belt and once slapped him on the face. He described Cindy's temper as "hair trigger and violent" and said Cindy sometimes took that violence out on the petitioner. As the petitioner got older, Cindy's discipline became more verbal rather than physical, with her shouting and scolding the petitioner, mostly at home. However, occasionally, Cindy "would blurt out in public and get real mad and shout."

Ronnie said that he worked several jobs and went to school upon his return to the United States and acknowledged that he had little time for Cindy or the petitioner. After about four or five years, Cindy started working outside the home. Cindy initially wrote and received letters from her family in Taiwan three or four times a month, but the correspondence dropped to once or twice a month and then to "one every now and then." Ronnie estimated that while Cindy was living in Taiwan, she supplied ninety percent of her family's support. Cindy did not like Ronnie's family and did not trust them. Cindy liked to gamble at the VFW and American Legion Club and often lost all her money but wanted to continue gambling anyway.

Ronnie said that he was not contacted by the petitioner's defense team in 1998 but would have testified at the petitioner's trial if he had been contacted. He said that he still cared about the petitioner.

Dr. John Franklin Copper, a professor at Rhodes College in the Department of International Studies, testified that he taught courses on Asia and had written books about Taiwan. He also studied in Taiwan, lived there approximately six years, and married a Taiwanese woman. Dr. Copper said that, in Asian cultures, shame is used as a method of controlling people and, as a result, Asian people have a "tremendous problem" adjusting to the culture in the United States because there are no "restrictions on their behavior here." He interviewed the petitioner, Ronnie, and Cindy. The petitioner was very forthcoming with most of the questions Dr. Copper asked him but said he could not remember when asked

about his life in Taiwan. The petitioner did discuss his school, his friends, and the place where he grew up. He related that he often "skipped" school and was punished by the teacher or the principal. The petitioner denied that he experienced any discrimination in Taiwan because of his mixed race and reported that he "experienced racial prejudice only in the United States." However, based upon Dr. Copper's personal experience of living in Taiwan and having children of a mixed race, he believed that the petitioner would have been discriminated against in Taiwan. Dr. Copper explained that the petitioner's mother's associating with an American soldier caused the petitioner to experience problems "many, many fold more," explaining that the petitioner's neighbors "would have made comments whenever they saw him, said derogatory things, racist kind of comments." Dr. Copper opined that the petitioner skipped school because he "didn't feel welcome there and he was no doubt harassed by the other kids, mistreated, called names, things said about him." As a result of the petitioner's mother's occupation, the Taiwanese community would have treated her "[b]adly" although the community would have had some realization that she was working as a bar girl to support her family, but "[p]eople would have said nasty things about her, to her . . . [and] really didn't have much sympathy."

Elizabeth Benson, a legal investigator with the Shelby County Public Defender's Office, testified that she worked as a mitigation specialist on the petitioner's case. Her caseload at the time of the petitioner's case was "pretty heavy," and she estimated that she was working on approximately seventy-five cases, including at least fifteen capital cases. She gathered information about the petitioner's background and social history. She recalled talking to one of the petitioner's ex-wives, Pamela Bigelow, but was uncertain if she had talked to the petitioner's mother. She could not recall if she interviewed the petitioner's other ex-wives, his stepchildren, or stepfather, explaining that she did not have her notes on the case because she had been unable to locate her case file. The petitioner reported to her that he was born in Tai Pei, Taiwan, but the defense team did not consult a cultural expert. Benson said that she did not interview Sharon Powers because "[i]t would have had to be at the request of the [petitioner] and . . . the lead attorney, giving me instructions as to whether or not to speak with [her]."

On cross-examination, Benson acknowledged that her intake report reflected that the petitioner admitted he had a gambling problem. The petitioner did not report having a drug addiction, problems adjusting to life in the United States, or difficulty with his mother or family. Had the petitioner told her he had those types of problems, she would have included it in her report and sought the records of any relevant hospitalizations. Her report did reflect that the petitioner had used marijuana and beer but did not indicate if he had received treatment. The petitioner denied any involvement in the victim's murder. Benson could not recall how many times the defense team met to discuss the petitioner's case but said that the team conducted case review once a month.

On redirect, Benson acknowledged that the petitioner's medical records from Parchman Prison reflected that the petitioner had a history of "large amounts of alcohol use and moderate drug abuse." She said that she gave a copy to the petitioner's attorneys. She further acknowledged receiving a copy of the Tennessee Department of Correction records which reflected that the petitioner reported that "he went out and got drunk and got himself in trouble." As to the petitioner's alcohol use, the records indicated that the petitioner "started sneaking a drink every now and then at the age of six, or seven, but did not start drinking heavily until about the age of twenty, or twenty-one." The petitioner also reported that he smoked approximately half an ounce of marijuana weekly. Benson said this information would have been given to the petitioner's attorneys. She said that if she learned a client was suffering from depression, she and the defense attorneys would have addressed it.

Ralph Nally, a legal investigator with the Shelby County Public Defender's Office since 1979, testified that he was assigned to the petitioner's case and that his duties involved interviewing prospective witnesses, reviewing crime scene photographs, and examining crime scenes. He acknowledged that he had access to the discovery provided by the district attorney's office. He said he met with the petitioner several times but could not recall if he spoke to any witnesses in the petitioner's case. He said that Benson was responsible for the mitigation investigation. The entire defense team discussed the information they gathered and was concerned about the petitioner's "relationship with women based on some prior charges," which was brought up during the marital privilege hearing. The defense team also was concerned about the cultural aspects of the petitioner's life, but Nally could not recall if the team discussed getting an expert in Taiwanese culture.

On cross-examination, Nally said that the petitioner maintained that he was innocent and denied any involvement in the victim's murder. The petitioner did not give Nally the names of any alibi witnesses but "provided information as best he could." Nally said he did not detect that the petitioner had any memory or mental problems. He said that he met with the petitioner with the rest of the defense team and did not have any particular need to meet with him alone. The team met and discussed the petitioner's case on a regular basis.

Dr. Chien-Hung Rocco Cheng, the Director for Prevention and Early Intervention Services at the Pacific Clinics in Los Angeles, California and a native of Taiwan, testified that he worked with immigrants from Taiwan, Hong Kong, China, and Korea. He was asked to assist in the petitioner's case as a cultural expert and traveled to Taiwan to interview the petitioner's family, neighbors, and elementary school teachers. He explained that Shilin, where the petitioner grew up, is a suburb of Taipei. Dr. Cheng described the petitioner's family home as "very dingy, . . . very small and dark." At the time the petitioner was growing up, the home did not have a bathroom or running water.

Dr. Cheng learned that Cindy Powers, the petitioner's mother, was the oldest girl in a family of twelve children and was the only girl kept by the family, explaining that several of her siblings were given up for adoption because the family was very poor. Instead of carrying the burden of supporting the family after their father left, Cindy's older brother drank and gambled. As a result, Cindy began supporting the family at a very young age by gathering vegetables and grains that were dropped in the fields or snails to sell at the market. As a teenager, she worked in a tea house where working-class Taiwanese men went after work "to have tea and also to flirt with the attendants, and sometimes they could go more with extra negotiation," meaning a sexual relationship for money. About a year later, Cindy went to work in a bar that catered to American soldiers which generated much more income for the family. Dr. Cheng explained that while the family had to rely on Cindy for financial support, it was also very painful for Cindy "to go into the trade" because Chinese people "look[ed] down upon that occupation in the society . . . [and] [she] ha[d] to face the rejection and discrimination from the society."

Dr. Cheng said that Cindy had three children, with the petitioner being the youngest. Cindy gave up her second child, a daughter, for adoption soon after she was born because she could not afford to raise her. The petitioner's half-brother, who was about three or four years older than the petitioner, had problems with alcohol and gambling. According to one of the petitioner's uncles, several members of the petitioner's family drank and gambled excessively. As a result, the petitioner was exposed to both gambling and alcohol at a very young age. Because the petitioner's mother worked in Taipei, his grandmother assumed the role of mother and was very loving and nurturing to the petitioner. Dr. Cheng said that, in the 1950s in Taiwan, there was "a lot of negative connotation associated with" biracial children, such as the petitioner.

Dr. Cheng opined that Cindy was not prepared to marry Ronnie or move to the United States and that the petitioner's departure from Taiwan was "very sudden." Having to leave his grandmother who was his "constant source of love and care and support" was very traumatic for the petitioner. The petitioner faced difficulty because he did not speak the English language and had to assume a new identity when his name was changed from Wu Chin-Ming to Gerald Lee Powers. The petitioner was not allowed to speak his native language in his new home in the United States and had no one to support or mentor him. The petitioner told Dr. Cheng that he always felt like he was "an outsider, he doesn't belong to anywhere." The petitioner did not feel accepted in Taiwan because he had a foreign father or in the United States because he did not speak the language.

On cross-examination, Dr. Cheng acknowledged that the petitioner's grandmother took good care of the petitioner and that they loved each other. He also acknowledged that the petitioner learned the English language quickly, participated in sports, excelled in math,

and did well in school. Dr. Cheng explained that immigrant children usually adjusted better than their parents and opined that "on the outside on the academic realm [the petitioner was] doing well but emotionally he continue[d] to struggle and . . . to suffer." According to Dr. Cheng, the petitioner's emotional damage would be "very difficult" to heal and could have had a "long term impact on his inter-personal relationships."

Dr. William D. Kenner, a psychiatrist with specialty training in child psychiatry and psychoanalysis, testified that he evaluated the petitioner in 2005 and interviewed the petitioner's first wife, Pamela Bigelow; his stepfather, Ronnie Powers; and his daughter, Jamie Powers. Bigelow reported that the petitioner was never physically violent with her and was respectful to her. Dr. Kenner reviewed the transcript of the marital privilege hearing and said that allegations of domestic violence were made by Sharon Powers, the petitioner's wife at the time of the victim's murder. Dr. Kenner opined that Sharon "did not look victimized from her testimony and what other people said about her." He said that Sharon's past abusive relationships should have been explored during cross-examination and that she was "probably a very damaged woman" which would make her testimony suspect. Dr. Kenner said that Margaret York observed bruises on Sharon's legs and witnessed "a fuss" between Sharon and the petitioner. Asked why Sharon would allege domestic violence if it was not true, Dr. Kenner opined:

> Well, if you look at her history she's had four prior marriages. She testified that two former husbands were alcoholics and two were abusive to her. She said she picked [the petitioner] out in prison as a pen pal and visited him and then with his release . . . she became his lover and then she married him.
>
> I mean, that's got to say a lot if a woman picks a man out in prison. And what she described she liked about him was . . . his intelligence and the fact that the guards and the inmates both appreciated him. So, I mean, she picked [the petitioner] out because he was well organized, he was well thought of even in a tough prison setting.

Dr. Kenner said that Sharon related that she was "very much in love" with the petitioner and that although she had "called the shots in her previous marriages," she had finally found someone she could love. Dr. Kenner learned from Margaret York that Sharon and the petitioner had "money struggles" and that Sharon stole money from the petitioner. The petitioner described Sharon as "insecure and uncertain about how to handle her children and her life," which was consistent with someone who had been "a victim of severe abuse growing up because she ha[d] no internal model to how to be a mother, how to structure a family." Dr. Kenner opined that Sharon was "quite a jealous woman," but she answered no

when asked if she thought the petitioner had ever cheated on her. However, Margaret York related that "if anybody should have been jealous it was [the petitioner] because Sharon was the one who'd get out and flirt with guys. She was the flirty one, it wasn't [the petitioner]." Dr. Kenner said that Sharon did not fit the profile of a victim of domestic violence because she did not have trauma-related symptoms. He said it would have been important for trial counsel to have a domestic violence expert "to help them understand the facts as they emerged" in the petitioner's case and also to testify about whether domestic violence had actually occurred.

Dr. Kenner testified in detail about the development of a child's brain and the effect that nurturing has on a child. He said that certain events in the petitioner's childhood might have affected his development: the petitioner was raised by his grandmother while his mother lived in Taipei; he was physically abused by an alcoholic uncle; he experienced chronic stress from "stigmatized social status" because he "was of mixed race and in a homogeneous island culture"; his mother was "psychologically damag[ed]" as a result of being a "sex worker"; his mother was "emotionally numb" and did not have a normal mother/child relationship with the petitioner; the petitioner was "recognized as a product of a coupling between his mother and a G.I."; he was taken away from his grandmother to come to the United States; and the petitioner's family "put a lot of pressure" on him because he was "so smart." Dr. Kenner opined that the petitioner had "very good development" until he was taken away from his grandmother and "essentially bec[ame] an orphan because his mother couldn't take care of him, she was in a strange culture." The petitioner's mother was "not able to step in and fill the emotional void left by [the petititoner's] grandmother. . . . [S]he had an impaired ability to love." As to the petitioner's brain development, Dr. Kenner said:

> I don't think it developed normally. I think he did experience significant traumas growing up, and I think that the chief one was anytime something threatened his primary relationship unfortunately he had other problems as well. He had a drinking problem, he used drugs. . . .
>
> He was struggling with compartmentalized feelings and traumatic memories that were left over from those early experiences of the things that had happened to him in Taiwan, the way he was looked down upon, the loss of his grandmother coming to a completely strange culture. He didn't know the language, the kids taunted him and kidded him in Murfreesboro because can you imagine going in the fifth grade and not knowing the language. I mean, that would be [a] phenomenal struggle. But, you know, he made it.

Dr. Kenner said that the petitioner struggled with "intense rage, fear, resentment, [and] shame." He explained that the petitioner, in his adult life, had eruptions where "some of this

old rage breaks through[,] he is violent in generally a single episode and then he's intensely ashamed of himself afterwards." Dr. Kenner said that the characteristics of developmental trauma disorder from which the petitioner suffered included triggered patterns of repeated disregulation in response to trauma cues, affective changes, somatic changes, behavioral changes, confusion, disassociation, relational problems, self-attribution, self-hate, and disorganized thinking. However, he described the petitioner as "an extremely smart fellow . . . conscientious, he strives to be well organized, to work hard, to be well respected, to do great things."

On cross-examination, Dr. Kenner said that the petitioner refused to discuss the victim's murder with him. He opined that the petitioner's seeing the victim "hit the jackpot" triggered a reaction because the petitioner's mother was "a prostitute/bar girl, and [the petitioner was] around . . . other women who were similarly partying out, was that somehow connected with mother having a few drinks and having men over." Dr. Kenner acknowledged that the petitioner followed the victim around the casino, observed her win about $5000, followed her fifty-two miles to her house, kidnapped her in the driveway, drove her to Eudora, Mississippi, where he killed her, took her jewelry and money, went back home and told his wife about it, hid the proceeds, and then fled to Texas where he was apprehended.

James Simmons testified that he had been licensed to practice law in Tennessee since 1982, had practiced exclusively criminal defense law since 1989, and had devoted his practice primarily to death penalty litigation since 1995. He said he had presented national and state seminars dealing exclusively with the death penalty. He had handled approximately twenty death penalty cases, four of which actually went to trial, and also had tried a federal capital case in Virginia. He related that by 1998, studies of death penalty cases showed that jurors tended to place more weight on the testimony of lay witnesses rather than defense expert witnesses. Simmons said he learned from jury consultants that a defendant's life history was better told through lay witnesses such as teachers, friends, neighbors, and employers. He said that it was important to make personal contact with lay witnesses and build a rapport with them and that he had found telephone contact to be unreliable.

As to the petitioner's case, Simmons said he would have investigated childhood matters including going to Taiwan to learn what happened in the first ten years of the petitioner's life and interviewing the petitioner's relatives, teachers, and friends. He also would have gone to Murfreesboro to review school and other records. He explained how an expert could have been beneficial in the petitioner's case:

First you'd have to conduct the investigation as to determine what, in fact, happened, and then I think any child developmental or adolescence

psychologist is going to be able to explain very easily why the first three years of childhood matters. First three years of childhood they'll say over and over again so many personality traits are developed during those years.

And an expert would come in and then to explain why this happened during the first[] three, four years of life now has influenced this person regarding the conduct.

Simmons said that it was "absolutely important" to prepare for voir dire in jury selection. Prior to 1998, he was taught to use jury questionnaires to ascertain jurors' views on theories of mitigation and whether "they could realistically consider those theories in light of the horrible circumstances of the case." As to the petitioner's case, Simmons said he would have asked the jurors if they could consider mitigation for the petitioner if he had convictions for "three prior aggravating assaults" as well as first degree murder. Simmons opined that individual voir dire was required in two areas – the publicity of the crime and the jurors' attitudes concerning the death penalty – and was necessary to avoid tainting the jury pool.

Simmons said that initial interviews with clients were generally not productive and that he had to invest a tremendous amount of time with a client to build a rapport. He explained that a client's social history was the "foundation for any thorough investigation by mental health professionals." He said that if he had a client who was from another culture, he would want to obtain a cultural expert because the culture from a person's "formative years has got to be explained in order to put it in context as to where you are now." Simmons said that "it takes time to build a rapport and conduct the proper thorough mitigation investigation. It just takes time and a lot of time, and the failure to devote that time will result in an inferior investigation."

According to Simmons, by 1998, the prevailing practice in capital cases was the "team concept with multiple disciplinarian members of that team." He said that "each member of the team ha[d] to have the proper amount of time available to devote to a particular case." He said that the lead attorney was ultimately responsible for the members of the team and that each member, with his or her particular expertise, was "expected to perform the investigation in that area thoroughly, and then . . . communicate with one another frequently and often." Simmons opined that the key to a successful team was communication.

On cross-examination, Simmons acknowledged that he was not familiar with the petitioner's case and had not talked to any members of the petitioner's defense team. He agreed that every case is different and that attorneys have to deal with their clients and the facts that they have.

-24-

In rebuttal, the State recalled the lead prosecutor who testified that, at the time of the petitioner's trial, she had no knowledge of a videotape of a hypnosis session of one of the State's witnesses and only learned about the existence of the tape a few months before the post-conviction hearing. She said the tape had been found in the property and evidence room of the police department.

## ANALYSIS

### I.  Applicable Law

### A.  Post-Conviction Standard of Review

Post-conviction relief is available to a petitioner who establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103 (2006). The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. Id. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the post-conviction court "are entitled to substantial deference on appeal unless the evidence preponderates against those findings." Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001); see also Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review is of purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields, 40 S.W.3d at 458; Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

### B.  Law Applicable to Post-Conviction Petitions

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

## II. Ineffective Assistance of Counsel

The petitioner alleges that trial counsel were ineffective during all phases of the trial, voir dire, guilt or innocence, and punishment. We will review his claims.

### A. Voir Dire Process

The petitioner sets out a number of alleged errors made by trial counsel during voir dire. The State responds that "the petitioner neither claims nor has introduced proof that any juror who heard his case was unfair or partial."

### 1. Adequacy of Voir Dire to Expose Biases of Prospective Jurors

The petitioner argues that trial counsel "used a leading, closed-ended question and then polled the jury for their responses, effectively eliciting no insight or revelation about the individual juror. Without such questioning, counsel could not get to the heart of each juror's biases."

-26-

The State responds that the petitioner "cannot point to a single biased juror who was seated on the jury as a result of counsel's failure to ask those questions," referring to the petitioner's claim that his trial counsel had not "ask[ed] any provocative questions whatsoever regarding potential hot-beds of bias in this case, including: bi-racialism, violence against women, substance abuse, gambling addiction, immigrants and prostitution."

On appeal, more specifically, the petitioner argues that trial counsel should have questioned a juror who was a charge nurse at a juvenile psychiatric facility "to explore her experiences with disturbed children, her beliefs about human behavior, and her opinion about mental illness."

As we will set out, the post-conviction court found that the petitioner failed to show that he was prejudiced as to this claim.

Additionally, the petitioner asserts that trial counsel should have further questioned another juror "about [the juror's] uncle who had disappeared under circumstances strikingly similar to the case at bar." The post-conviction court determined that this claim was without merit:

> [The juror] stated that he could set his family matter aside and be impartial. [The juror] stated that he did not know anything about the details of his uncle's situation. Thereafter, [defense] attorney . . . asked an additional series of questions relating to [the juror]'s ability to be impartial to both sides. [The juror] continued to assert he could be impartial.
>
> This court finds petitioner's counsel w[ere] not ineffective in failing to challenge [the juror] for cause. Given [the juror's] responses such a challenge was not warranted. Moreover, even if counsel should have used a peremptory challenge to exclude [the juror] from the jury, based on [the juror's] responses, this court does not find petitioner has demonstrated he was prejudiced by counsel's inaction.

We concur in both of these determinations by the post-conviction court.

As to the petitioner's claims that trial counsel were ineffective in their voir dire, the post-conviction court determined that he had failed to show prejudice:

> Addressing the prejudice prong of the Strickland test first, we conclude that the petitioner has failed to establish any prejudice resulting from counsel's

alleged deficiencies in conducting *voir dire*. The petitioner generally alleges that counsel failed to question prospective jurors sufficiently to expose any potential biases they might have, based on his cultural background. However, the petitioner fails to point to any evidence that suggests that a biased juror or jurors were seated on the jury as a result of the asserted acts or omissions of his attorneys. Thus, the petitioner failed to establish that but for counsel['s] unprofessional errors, the results of the proceeding would have been different and is, therefore, not entitled to relief on the basis of this claim. Strickland [v. Washington], 466 U.S. [668,] 689-90, 104 S. Ct. [2052,] 2064-65 [(1984)].

We agree with the post-conviction court. Without the petitioner showing that he was prejudiced, other than in theory, as the result of the alleged errors by trial counsel in selecting the jury, his claim in this regard is sheer speculation and without merit.

## 2. Effect of Counsel's Not Asking "Whether any Juror Would Automatically Vote for Death or Refuse to Consider Mitigation"

The petitioner argues that "[c]ounsel rendered ineffective counsel by failing to conduct an adequate voir dire and performing essentially no 'death qualification' or 'life qualification' of jurors." The State responds that "the record demonstrates that counsel did engage in such questioning with prospective jurors and that counsel's questioning of jurors was sufficient to empanel a fair and impartial jury."

The post-conviction court explained why this claim was without merit:

During the *voir dire* of the jury panel, trial counsel made the following statement relating to mitigating circumstances:

And that if the defense so chooses . . . we can put on proof of mitigating circumstances or reasons why [petitioner's] life should be spared. Or you as a juror based on the proof you heard can make a determination of what you might think would be mitigation or reasons why his life should be spared. . . . So we're talking about aggravating circumstances. Reason why his life should be taken. And mitigating circumstances reasons why his life should be spared.

Additionally, both the trial court and the prosecutor made various statements relating to how the jury was to weigh mitigation and explained that the State had the burden of demonstrating the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

-28-

Following the conclusion of the sentencing hearing, the jury was properly instructed as to how to consider mitigating circumstances.

At the post conviction hearing, the petitioner presented little proof in support of this allegation. Very few questions regarding this claim were addressed to counsel. Moreover, the petitioner did not present testimony from jurors who claimed to be confused as to the meaning of mitigation or the process by which such proof was to be evaluated. Therefore, the petitioner has failed to show that, had counsel more fully explained the meaning of mitigation and questioned jurors about their feelings regarding mitigation, a reasonable probability exists that the jurors would have concluded that the ["]balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069. Thus, petitioner[] is not entitled to relief on the basis of this claim.

The post-conviction court explained further why this claim was without merit:

At trial, counsel specifically asked the jurors, "[D]oes anyone believe that because a person's life had been taken or a person is now deceased, that someone should automatically get the death penalty? Does anyone believe that?" Trial counsel went on to inquire of each individual juror whether they thought the death penalty should be "automatic." Earlier in the *voir dire* process, the jurors had been given information about the charges filed against the petitioner. Thus, the jury was aware that, if they found the victim's "life had been taken" by the petitioner under the circumstances alleged by the State; then they would have found petitioner was guilty of murder in the first degree. Therefore, this court finds, even if counsel were deficient in failing to more precisely phrase their questions to the jury, petitioner failed to demonstrate prejudice. Petitioner is not entitled to relief on the basis of this claim.

We conclude that the record supports these determinations by the post-conviction court.

### 3. Failure to Appeal Denial of Individual Voir Dire

As to this issue, the petitioner argues that counsel should have appealed the denial of individual voir dire and renewed their request for each juror who said that he or she knew of the case, so as to determine what information each prospective juror had and whether their exposure to such information was prejudicial.

The post-conviction court found this claim to be without merit:

-29-

[T]his Court does not find counsel w[ere] ineffective in failing to raise this issue either in their motion for new trial; moreover, even if ineffective, it is clear from the case law that petitioner is unable to demonstrate prejudice. Thus, petitioner is not entitled to relief on the basis of this claim.

The record supports this determination by the post-conviction court.

### 4. Failure to Request Alternative Method of Questioning Jurors

The petitioner argues that counsel were ineffective because, beyond filing a motion for individual voir dire, they "failed to take additional steps to ensure that they would have the information necessary to exercise both motions to strike biased jurors for cause and to exercise the defense's peremptory challenges."

The petitioner's brief does not explain what alternative methods should have been utilized or what would have been achieved by their use. Likewise, the petitioner does not refer this court to places in the record showing that the petitioner was prejudiced by this alleged ineffectiveness by trial counsel. Accordingly, we conclude that this claim is without merit.

### 5. Failure to Object to or Correct Misstatements by the State

The petitioner argues that counsel should have objected to certain misleading statements as to the law, that the defense has to prove mitigating evidence, rather than merely presenting evidence of the circumstances, and by questioning jurors as to whether "they could sign their name to a death verdict if [the petitioner] were convicted."

The post-conviction court determined that trial counsel were not ineffective in this fashion and explained that, even if this had been the case, the court's instructions correctly explained the law in this regard:

[B]ecause the trial court properly instructed the jury prior to their deliberations on the sentencing phase of petitioner's trial, this court finds petitioner has failed to demonstrate he was prejudiced by trial counsel's inaction. It is an elementary principle of law that jurors are presumed to follow the instructions of the trial court. State v. Williams, 977 S.W.2d 101, 10[6] (Tenn. 1998) (quoting State v. Cribbs, 967 S.W.2d 773, 784 (Tenn. 1998); State v. Laney, 654 S.W.2d 383, 389 (Tenn. 1983)). Thus, this court finds petitioner is not entitled to relief on the basis of this claim.

The record supports this determination by the post-conviction court.

## B. Effect of Procedural Errors by Trial Court During Voir Dire

### 1. Denial of Defense Motion for Individual Voir Dire

The petitioner argues that the trial court erred in denying his request for individual voir dire. The court determined that this claim was without merit, noting that the "prevailing practice [was] to examine jurors collectively." Further, the court noted that, "even in a capital case, there is no requirement that death qualification of a capital jury must be conducted by individual, sequestered *voir dire*." Thus, as to this issue, the post-conviction court found that the petitioner was not able to show that trial counsel were ineffective, that he was prejudiced by the fact that counsel did not appeal the trial court's ruling in this regard, or that the trial court erred in this ruling. The record supports this determination.

### 2. Limiting Counsel's Questioning During Voir Dire

The petitioner argues that the trial court "impermissibly curtailed counsel's ability to rehabilitate and life-qualify jurors and violated [the petitioner's] constitutional right to a fair and impartial jury."

Specifically, the petitioner asserts that, after the trial court had instructed counsel to get "more succinct" and "to the point," counsel did not try to "thoroughly rehabilitate another potential juror." Thus, according to the petitioner, the court violated his right to a fair and impartial jury.

The post-conviction explained why this claim was without merit:

> This Court does not find anything improper or prejudicial about the trial court's statements. The trial court was merely attempting to maintain some clarity for the jurors regarding the unique issues associated with sitting on a capital jury. The potential jurors were not present when the statements were made and the statements were directed at both the prosecution and the defense. There must be some order in the *voir dire* examination of jurors. That is the court's function. See State v. Banks, 271 S.W.3d 90 (Tenn. 200[8]). This Court does find[] petitioner is not entitled to relief on the basis of this claim.

The record supports this determination by the post-conviction court.

## C. Guilt/Innocence Phase

### 1. Counsel's Excessive Caseloads

The petitioner argues that "counsel's excessive caseloads created a conflict of interest." However, the post-conviction court noted that both counsel denied this claim was true and determined that this claim was without merit:

This court finds this allegation is without merit. While both . . . lead counsel and . . . co-counsel had very full schedules, this court does not find their case load hindered their ability to perform their responsibilities relating to petitioner's case. Both [counsel] were seasoned counsel who had a great deal of experience with capital litigation and considerable experience managing a large caseload. [Co-counsel] testified that, at the time of petitioner's trial, she was serving as a supervisor for the capital defense team of the Shelby County Public Defender's Office. Thus, she had considerable experience managing multiple cases. Additionally, [co-counsel] testified that her case load and other responsibilities did not hinder her ability to serve as co-counsel in petitioner's trial.

[Lead counsel] testified that, at the time of petitioner's trial, he was lead counsel on approximately five to ten other homicide cases and co-counsel in [a] similar number of homicide cases. However, [lead counsel] indicated that not all of the homicide cases he was involved with were capital cases and not all of those cases were cases in which he expected the case to proceed to trial. Moreover, he stated that, while in hindsight there may have been other things he would have done on petitioner's case if he had more time, he did not feel his case load prevented him from providing effective representation in petitioner's case.

After reviewing the testimony of [trial counsel], this court does not find that their case loads were so unmanageable as to prevent them from rendering effective assistance of counsel in petitioner's case. Thus, this court finds petitioner is not entitled to relief on the basis of this claim.

Other than making arguments in this regard, the petitioner has not provided references to the record on appeal showing that he was prejudiced by the alleged excessive caseload of counsel. Previously, we have set out responses of defense counsel denying this claim. Accordingly, we conclude that the record supports the determination of the post-conviction court that this claim is without merit.

-32-

## 2. Counsel's Not Objecting to Late Court Days

The petitioner asserts that counsel should have objected to the fact that "court began at approximately nine in the morning and continued in session past ten o'clock in the evening on several occasions." Likewise, the post-conviction court found this claim to be without merit:

> Both trial counsel testified that they remembered working into the evening hours several nights; but, stated that they did not feel the long hours were excessive and indicated that the trial court consulted with the jury regarding their desire to continue working. Thus, this Court finds, even if counsel should have lodged an objection to the long hours, [the petitioner] has not demonstrated he was prejudiced by their inaction and is not entitled to relief on this issue.

The petitioner has not directed us to any part of the record on appeal which shows that he was prejudiced by the hours that the court was in trial on this matter. We, therefore, conclude that the record supports the determination of the post-conviction court that this claim is without merit.

## D. Failure to "Thoroughly Investigate Available Evidence"

### 1. Undercover Tapes of Margaret York and Sharon Powers

The basis for this claim is trial counsel's receiving, the night before she was to testify, an audiotape of conversations between State's witnesses Margaret York and Sharon Powers. Although counsel had been advised that "there was nothing on them that was intelligible," counsel listened to the tapes and determined "there were some voices that were recorded." While the court denied counsel's request for a delay in the proceedings so that the tapes could be transcribed, the court directed that the tapes be transcribed by the Shelby County Public Defender's Office. The petitioner's counsel did not receive the transcripts of the tapes until after Sharon Powers had testified. At the evidentiary hearing in this matter, the petitioner's counsel acknowledged that, while listening to the tapes, he heard Powers state, "[T]he man said he didn't do it." Counsel testified that he could have utilized this statement in cross-examining Sharon Powers.

As to this matter, the petitioner argues on appeal that "[d]efense counsel's foregoing of the opportunity to diminish the credibility and weight of the prosecution's key witness amounted to a 'significant dereliction of duty.'" The State responds that the petitioner has

failed to establish either that counsel were deficient in this regard or that he was prejudiced thereby.

In the findings of facts and conclusions of law regarding this matter, the post-conviction court described these tapes, saying that lead counsel testified that, prior to the trial, he was aware that the tapes existed but had been told by the State that they "did not contain any discernable conversations." According to the findings of the post-conviction court, the petitioner's trial counsel were given access to the tapes approximately a week prior to the trial and listened to them the night before Sharon Powers was to testify. As the post-conviction court explained, the part of the conversations between Sharon Powers and Margaret York which could be heard saying "the man said he didn't do it" would have been of minimal benefit to the petitioner:

> Petitioner asserts that had counsel listened to the tapes in the weeks leading up to the trial, the statement now in issue would have been available for use as impeachment. This Court finds that, while this statement may have offered additional impeachment of Powers, when viewed in light of Sharon Powers['] trial testimony and the deposition testimony of Margaret York which was also introduced at trial, the statement has minimal value. Perhaps trial counsel were ineffective in failing to timely request, review and transcribe the tapes; however, this Court simply does not find that the value of the tapes was so great as to demonstrate that counsel's inaction resulted in prejudice to the petitioner.

> This Court further notes that in six hours of audio tapes this is the only statement which petitioner asserts trial counsel w[ere] ineffective in discovering and utilizing. In fact, post conviction counsel concedes that out of three tapes, the tape containing the statement at issue is the only one that is audible. Additionally, it appears the tapes were enhanced with technology that may not have been available to trial counsel at the time of petitioner's trial. For the above reasons, this Court finds petitioner is not entitled to relief on the basis of this claim.

As to these findings, the petitioner argues that the record "suggests that the inability to properly use the tapes during [his] trial was a direct result of counsel's failure to thoroughly investigate the surveillance tapes." Additionally, the petitioner argues that the record does not support the determination by the post-conviction court that the tapes could not have been enhanced in 1998, the time of the trial in this matter. The State responds that the record supports the finding of the post-conviction court that Powers' statement would have been of "minimal value" in cross-examining Powers. Further, the State asserts the court's finding that

-34-

the petitioner failed to show that the technology of 1998 could have enhanced the tape is supported by counsel's testimony that, in 1998, he had not believed that "the condition of the tapes could have been improved."

We agree with the post-conviction court's determination that, given the proof against the petitioner, utilization of the statement, "the man said he didn't do it," would have been of minimal value in the cross-examination of Sharon Powers. Accordingly, as to this issue, we concur with the finding that the petitioner has failed either to show that counsel were negligent or that he was prejudiced thereby.

## 2. Failure to Utilize Sharon Powers' Letter

The petitioner argues that trial counsel should have utilized a letter from Sharon Powers to her mother which contained "glowing descriptions of the marital relationship with Ms. Powers and her husband." According to his argument, this letter could have had an effect upon the trial court's ruling as to the marital privilege. The State responds that trial counsel could not have utilized the letter at trial because it was in the possession of federal investigators and that, even if available, it would not have changed the court's ruling in this regard.

The post-conviction court determined that this letter would not have affected the ruling of the court as to this matter:

> [A]ccording to the trial record, [lead counsel] brought this issue before the trial court prior to the presentation of Sharon Powers' testimony. During the discussion of this issue, Assistant District Attorney General . . . stated that the evidence in question was in federal custody and had not been made available to the [S]tate until August of 1998. Thereafter, he made the evidence available to defense counsel who, in turn, raised the issue with the trial court prior to Ms. Powers' testimony.
>
> > The trial court stated for the record that:
> >
> > [B]ased on the nature of these items that [lead counsel] has referred to, I will state that those were both points that were well made and well argued by the defense at the time.
> >
> > I mean it may well be that this would have been some additional material to underscore their points, but both of those points that these two documents apparently relate to were certainly well

-35-

made and well argued by the defense at the time.

> So it's not as though it was something, some new revelation that would have been, I think, if anything, cumulative to what was already before the court in terms of factual and legal issues.

Thus, it appears even if counsel had located this item prior to the marital privilege hearing, it would have had little impact on the trial court's findings. Therefore, even if counsel were ineffective, petitioner has failed to demonstrate he was prejudiced by their conduct.

We conclude that the record supports the determination of the post-conviction court as to this issue.

### E. Failure to Retain Fiber Expert

The petitioner argues that trial counsel were ineffective in not calling an expert witness to rebut the testimony of Special Agent Hopkins "regarding a fiber found in the Petitioner's car that was consistent with the victim's clothing." The State responds that the petitioner failed to show that trial counsel's intended use of the defense expert, to suggest cross-examination of the State's expert witness, was not reasonable.

As to this issue, defense counsel testified at the evidentiary hearing that he reviewed fiber analysis treatises and obtained funds for a fiber polymer chemistry expert, whom he consulted in preparation for the cross-examination of the State's fiber expert.

The post-conviction court found that this claim was without merit:

> Agent Hopkins' report, notes, and trial testimony indicated that the "black wool textile fiber" found in Ms. Powers' car was consistent with the fibers found in the coat and/or the dress worn by the victim at the time of the murder. At the post conviction hearing, William Pearce, an expert in the field of trace evidence, testified that he did not disagree with the conclusion that the fiber found in the car was consistent with the victim's clothing. He testified that his only disagreement with Agent Hopkins['] testimony was that he felt Agent Hopkins overstated the certainty of the comparison. It further appears from [lead counsel's] testimony that the expert they hired to review the State's fiber analysis also concurred with the results.

> Therefore, this court finds, even if counsel should have utilized their

fiber analysis expert during trial, petitioner has failed to show he was prejudiced by their inaction. Thus, he is not entitled to relief on the basis of this claim.

We conclude that the record supports this determination by the post-conviction court.

### F. Failure to Adequately Present Third Party Defense

As to this claim, the petitioner argues that trial counsel were ineffective in not utilizing evidence which showed there were problems in the victim's marriage and that her husband had motive to kill her. The petitioner explains that trial counsel attempted to present scenarios of three other persons as possible perpetrators: Brian Maher, with whom the victim recently had ended a romantic relationship; Brett Musekamp, another former boyfriend; and Robert Sanderson, her husband. The State responds that, at the evidentiary hearing, the petitioner did not call Maher or Sanderson as witnesses. Rather, the petitioner questioned trial counsel about a document from Investigator Nally, relating that Maher supposedly said that the victim was tired of her marriage and wanted a divorce. However, the post-conviction court found that these claims were without merit:

> With regard to Brian Maher, the Court held, "there was no evidence of animosity between the parties that would give rise to a motive to kill the victim." [Powers, 101 S.W.3d at 395]. Thus, the Court agreed with the trial court's determination that the evidence was not relevant under Tennessee Rule of Evidence 401. Id. As to the testimony of Brett Musekamp, the Court again agreed with the trial court's determination that the evidence was not relevant. Id. The Court held that "the mere existence of [Mr.] Musekamp's attempt to undermine the Sandersons' relationship is not relevant to establish a motive to kill Mrs. Sanderson." Id. [at 396]. Regarding the testimony of Robert Sanderson, as previously noted, the Court found, although relevant, the probative value of the proffered testimony outweighed the risk of confusion and misleading the jury. Id. [at 397]. The Court found Mark Burchfield's testimony should have been admitted[] but, also found the trial court's erroneous exclusion of the evidence was harmless. Id.

> Given the Tennessee Supreme Court's holding, even if counsel were ineffective in presenting this issue at trial, he cannot demonstrate he was prejudiced by counsel's inaction. Therefore, he is not entitled to relief on the basis of this claim.

The record supports this determination.

## G. Alleged Ineffective Assistance of Counsel as to Sharon Powers

The petitioner notes that, as to his motion to employ a psychologist to testify as to his claim that the marital privilege applied to the testimony of Sharon Powers regarding the petitioner, his counsel filed a motion that was "deficient in that it failed to name any particular expert, the location of the expert's office or any other necessary particulars." In this regard, the State responds that the post-conviction court determined that the petitioner's request for an expert in this regard was denied not because his motion was deficient, as the petitioner claims, but, rather, because the trial court did not find a particularized need for such services:

> Upon examining petitioner's motion for the services of a family counselor the trial court found:

> I don't think that this is the type of issue that necessitates an expert in psychology and/or sociology to testify in order to lay a factual foundation for the argument that I'm sure you'll make in this matter.

> I think that this is the type of issue – and I think the law would bear this out and case law over the years – that this is the type of issue that can be examined by the court and be reviewed by appellate courts more on what appears to be in the best interest of a marital relationship, view of the society's best interest, what the – just the general factual – underlying factual basis is for the continuation of a marriage. How solid the marriage is. How strong it is. The length of the marriage. All of these are evidentiary matters that can be presented.

> This isn't the type of field that would require in my judgment the expert testimony of a psychologist. Not to say that it's never been presented. . . . It may be in a perfect world with unlimited resources, you may want to put on half a dozen different psychologists and sociologists and marriage counselors to suggest – to bolster your point. But I think as far as making your point, laying an evidentiary foundation, I think being the experienced trial attorneys that you are, would certainly know how to go about laying and establishing a factual basis and then making the appropriate arguments. So, I'll deny the request for this particular expert.

In response to the trial court's findings, [lead counsel] clarified his request by stating,

> Your Honor does understand this is a parameter that I've had difficulty with since I first read State versus Hurley. I don't know how your Honor can be expected to judge what the community standards are as to whether his marital relation should be fostered without some proof as to the community standards. And that's the basis of –.

Following [lead counsel's] question, the trial court responded, stating,

> Well I think the public policy considerations can be considered by a court, can be argued by counsel, without the necessity of having different experts. I mean, you['re] asking for psychologists, sociologists, and marital counselors as well. Family counselors – specialized in the are[a] of marital relations. I'm not convinced that their, quote, expertise would guide us or would help us a great deal in our assessment of the nature of this particular marital relationship and whether or not it should be fostered.

> I think we can view factually what you all present to this motion and use as a back drop what the law has considered over the years and the case law and what public policy would dictate. And I think this determination could be made without the assistance. I don't think the assistance is so essential to this motion as to require, number one, the funding of these expert[s].

Thus, it appears the trial court did not deny the motion based on trial counsel's failure to include a particular expert in their request for funds. Rather, the trial court simply found that such assistance was not needed. Despite not listing an expert in their written motion, at the hearing trial counsel informed the trial court that, although they had not yet retained an expert, they had been provided a referral for an expert by Midtown Mental Health. Moreover, it is clear the motion was not denied based upon trial counsel's failure to make a more timely request. In fact, the trial court specifically spoke to the timing of the motion, stating:

> [T]his is probably the type of expert and the type of proof

that could be prepared in a relatively short period of time. I wouldn't imagine that it would take a great deal of time for this type of expert to interview your client and look in the record and make a few phone calls and be ready to testify in three or four weeks. I'm not suggesting that if I were to grant this that it would necessitate resetting the trial or anything. I don't think that's the case.

Based upon the trial court's remarks, this court further finds that, even if counsel should have filed their motion sooner and were ineffective in failing to list a specific expert, petitioner has failed to demonstrate he was prejudiced by counsel's inaction. It seems clear to this Court that the trial court did not find this type of assistance necessary and would not have been any more inclined to grant counsel's request if they had provided the name of an actual marital counselor.

At the post-conviction hearing, in support of his claim that such proof would have aided counsel both at the marital privilege hearing and at trial, petitioner presented testimony from psychiatrist, William Kenner. Dr. Kenner testified that the type of domestic violence testified to by Sharon Powers fits into the male controlling interactive violence category. He stated that the men that perpetrate this type of abuse are usually macho bullies. He stated that this type of abuse is about control and indicated the abuser used just enough violence to make sure that they maintain control. He stated that such men have a very patriarch centered view of family and explained that they often come from a family where violence is accepted. He stated they become violent to contain and control their wives who seek separation or divorce.

Dr. Kenner testified that the women who form relationships with this type of man have not been traumatized to the degree women with sadistically violent men have been traumatized. He stated that they usually have not been beaten up and are not scared for their lives. Dr. Kenner testified "this kind of male batterer is not going to kill his wife, he's just going to scare her a bit so she'll fall in line.["]

Dr. Kenner stated that he reviewed the history of the petitioner's marriage to Sharon Powers and found no domestic abuse complaints against petitioner prior to the filing of the criminal complaint. Additionally, he stated that he did not find that there was a history of abuse in petitioner's prior romantic relationships. Dr. Kenner also testified that he did not find Sharon

Powers was victimized. In fact, he stated that her background indicated that she might be emotionally volatile. He stated that she was a very damaged woman which made her testimony about abuse suspect.

Dr. Kenner acknowledged that Margaret York had described seeing bruises on Sharon Power[s'] legs. Dr. Kenner further noted that Misty Moore, Sharon Powers['] step daughter, testified at the marital privilege hearing that sometimes the petitioner would take Sharon Powers to the bedroom and when her mother would emerge from the bedroom she would be crying and she would see bruises up and down her arms and on her thighs. However, Dr. Kenner testified that this was not necessarily a sign of abuse. Rather, he indicated that because Sharon Powers had testified at the marital privilege hearing that the petitioner "would pull my hair and call me names . . . I was his sex slave, . . . his whore, . . his bitch," the bruises witnessed by Moore and York were more likely the result of "normal" sadomasochistic sex acts. Dr. Kenner also testified that Misty Moore's testimony was suspect because, at the time of the hearing, she was pregnant and needed her mother's assistance; thus, Dr. Kenner opined she likely lied to support her mother's position.

Dr. Kenner offered additional interesting observations regarding his opinion about the Powers['] marriage. He stated that York, "saw a fuss between Sharon and [the petitioner] and [the petitioner] was tossing dishes sort of back over his arms. And, you know, throwing dishes is usually a woman's thing but it doesn't necessarily imply domestic violence unless it's the good dishes, of course." As a means of explaining why Sharon Power[s] would have made up her claims of domestic abuse[,] Dr. Kenner offered the following:

> Well, if you look at her history she's had four prior marriages. She testified that two former husbands were alcoholics and two were abusive to her. She said she picked [the petitioner] out of prison as a pen pal and visited him and then with his release they became – she became his lover and then she married him. I mean, that's got to say a lot if a woman picks a man out in prison.

Additionally, Dr. Kenner stated that Pam Bigelow, petitioner's first ex wife, described Sharon as an insecure "drama queen," who was self conscious about her weight and indicated Bigelow had stated that Sharon would "show out" to get attention. Dr. Kenner indicated that this profile of Sharon Powers fit with his assessment that she had invented her claims of spousal abuse. Dr. Kenner testified that it is common for women to make up allegations of

-41-

domestic violence, especially where "victimhood has strategic advantage."

Even if trial counsel had been allowed to present testimony similar to that offered by Dr. Kenner, this court does not find the trial court would have given such testimony much credence. Dr. Kenner made general observations about Sharon Powers based upon information provided to him by petitioner and petitioner's first ex-wife. He never spoke with Ms. Powers or Ms. Moore. He does not seem to deny there may have been some level of abuse; rather it appears he contends Sharon Powers did not present as a victim of "physical" abuse. However, the trial court was in the position to judge the credibility of Powers and Moore and clearly accredited their testimony, finding the marital relationship was beyond "tumultuous." This Court simply finds petitioner has failed to demonstrate that, even if counsel had presented testimony similar to that given by Dr. Kenner, the trial court would have reached a different result. Thus, he is not entitled to relief on the basis of this claim.

We have carefully examined the testimony at the evidentiary hearing regarding this claim and find that it abundantly supports the conclusions of the post-conviction court.

Additionally, we note that, in the direct appeal of this matter, our supreme court concluded that the marital privilege was not applicable and the trial court was correct in allowing the testimony of Sharon Powers:

[W]e hold that the trial court did not err in applying the Adams factors to determine whether Powers' communications with his wife were privileged. Moreover, the record supports the trial court's findings regarding the application of the factors to the facts in this case. Consequently, the confidential marital communications privilege did not apply, and Sharon Powers' testimony was admissible.

Powers, 101 S.W.3d at 394. We conclude that the record supports the determination of the post-conviction court in this regard.

### H. Alleged Ineffectiveness as to Mitigation Phase

The petitioner argues that his trial attorneys were ineffective in a number of areas in the mitigation phase of the proceeding.

### 1. Whether Counsel's Decisions Were Informed and Reasonable

-42-

The petitioner argues that trial counsel should have known that the jury would learn of his three prior convictions for violent assaults on women and should have investigated these convictions so as to deal with them at the trial. He asserts that his explanation of his motivation for these assaults "demands the expert assistance of a mental health professional – assistance that trial counsel never sought."

The petitioner purports to describe trial counsel's actions in this regard by saying they did "nothing." The post-conviction court found this claim to be without merit:

> Based upon the proof submitted by the petitioner, this Court does not find counsel w[ere] ineffective in failing to obtain a more thorough mental health evaluation of the petitioner. With regard to the type of proof offered by Dr. Smith, this Court finds that counsel made a strategic decision not to pursue this line of questioning because the majority of the proof in support of this proposition was contained in the records of petitioner's past incarceration. Trial counsel felt this information was more prejudicial than beneficial. This Court sees no reason to question their decision.
>
> With regard to [the] type of proof offered by Dr. Kenner, this Court finds such proof may have added to petitioner's mitigation case. However, this Court does not find counsel w[ere] ineffective in seeking [sic] a mental health evaluation. As the entire defense team testified, there was no reason to believe petitioner suffered from mental health issues. Moreover, the diagnosis posited by Dr. Kenner is for an unrecognized disorder that was not even named or discussed until the 1990s, around the time of petitioner's trial. Therefore, it is unlikely that the trial court would have granted funds for a mental health evaluation. Thus, this court cannot find counsel were ineffective in failing to elicit this type of evaluation. Petitioner is not entitled to relief on the basis of this claim.

The record supports this determination.

Although, in the petitioner's brief, he refers to "red flags" in his records which should have alerted trial counsel to "potential psychological or psychiatric issues," he makes no reference to the record showing that he was prejudiced by the fact that additional efforts were not made in this regard by trial counsel. Accordingly, we conclude that this claim is without merit.

## 2. Effect of Counsel's Alleged Failure to Locate or Interview Relevant Witnesses

The petitioner asserts that trial counsel should have interviewed mitigation witnesses other than his mother. Specifically, he argues that counsel should have contacted and utilized James Ronald Powers, the petitioner's stepfather. The court described Mr. Powers' testimony at the post-conviction hearing:

> Arguably Powers' testimony could have been helpful in preparing petitioner's mitigation case. [Lead counsel] testified that the defense team anticipated the petitioner's mother would testify and provide many of the same details. However, he stated that at the last minute she refused to participate in petitioner's trial. Regardless, given the strength of the aggravating circumstances in petitioner's case, this court cannot find that, even if counsel were deficient in failing to present this evidence during the sentencing phase of petitioner's trial, petitioner was prejudiced by their inaction. Thus, petitioner is not entitled to relief on the basis of this claim.

The record supports this determination.

### 3. Sufficiency of Investigation into First Years of Petitioner's Life

The petitioner asserts that trial counsel were ineffective in that they "conducted no investigation whatsoever into the first ten years of [the petitioner's] life."

The post-conviction court concluded that this claim was without merit:

> At the post-conviction hearing, members of petitioner's defense team indicated that they were aware petitioner had spent the first ten years of his life in Taiwan and were aware that the petitioner had abused alcohol and drugs. Ms. Benson and trial counsel testified that, for purposes of mitigation, they intended to present evidence of petitioner's past through the testimony of petitioner and petitioner's mother. However, at the last minute, both chose not to testify. Additionally, members of petitioner's defense team testified that they did not want to overstate the impact of petitioner's cultural background since the petitioner had performed well both in sports and academics in the United States. They indicated they were concerned with losing credibility with the jury. Moreover, members of petitioner's defense team stated that the petitioner did not appear to have any mental health problems that needed to be reviewed.
>
> [Co-counsel] testified that records from petitioner's various phases of incarceration demonstrated that the petitioner had experienced some depression and had report[ed] using drugs and alcohol. However, she stated that there was

-44-

very little, if any, independent verification of these facts. Thus, neither she nor [lead counsel] felt that there was a need or a basis for further mental evaluation. Nearly all of Dr. Cheng's testimony was derived from information he received from petitioner's family members in Taiwan. [Lead counsel] testified that he was certain the trial court would not have authorized travel to Taiwan and likely would not have granted funds for such an expert.

Thus, the court determined that, although the additional mitigating evidence would have been helpful to the defense, "the evidence of aggravating circumstances in petitioner's case was extremely strong." Accordingly, the petitioner failed to establish that a "reasonable probability exists that the jury would have concluded that the 'balance of aggravating and mitigating circumstances did not warrant death.'" Strickland, 466 U.S. at 695; Goad v. State, 938 S.W.2d 363, 371 (Tenn. 1996). The record supports this determination.

#### 4. Effectiveness in Use of Expert Testimony

In his consolidated petition for post-conviction relief and on appeal, the petitioner alleges that "trial counsel were ineffective in failing to request or secure the services of necessary experts that would have included culture and language experts, an expert in addiction, and psychological or psychiatric experts." As examples of the kinds of testimony that trial counsel should have presented, the petitioner points to the evidentiary hearing testimony of Dr. John Franklin Copper and Dr. Chien-Hung Cheng (cultural and language experts), Dr. William Kenner (psychiatry and child psychiatry), and Dr. Murray Smith (types of addiction). The State responds by saying that "[t]he testimonies of Drs. Kenner, Cheng, and Copper demonstrate little more than that the petitioner was given a chance to have a better life than his family in Taiwan but, instead, chose to pursue a life of violent crime."

The post-conviction court explained the petitioner's proof as to these claims:

At the post conviction hearing petitioner presented several witnesses in support of this claim. First, Dr. Murray Smith testified that the petitioner has an addiction to alcohol and drugs and an addiction to gambling. He stated that early alcohol use by the petitioner and exposure to toxic solvents later in his life may have caused petitioner to suffer brain damage.

Franklin Copper, a specialist in Chinese culture, testified that the petitioner would likely have experienced discrimination in Taiwan based upon his bi-racial heritage; the fact that his father was an American G.I., and the fact that his mother worked as a "bar girl." He stated that due to the change in governance of Taiwan from Japanese to Chinese, petitioner and his mother

could have spoken different languages and would have had very different experiences making it difficult for them to communicate and connect.

Dr. Ch[ien]-Hung Rocco Cheng, an expert in multi-cultural and community psychology, testified that immigrant families experience unique struggles with language and culture. He stated that there was a history of alcoholism and gambling in petitioner's Taiwanese family. He further stated that the petitioner and the petitioner's family would be looked down upon in Taiwanese culture because of petitioner's multi-racial background and petitioner's mother's occupation. Dr. Cheng stated that, because petitioner's mother was away from the home, petitioner's grandmother took on the role of petitioner's psychological mother. Thus, he explained that leaving his grandmother was a very traumatic event for petitioner. He further explained that this trauma was compounded by the fact that the petitioner was coming to a country w[h]ere he did not speak the language, to a culture he did not understand, with a new name and a new family. Dr. William Kenner[] testified similarly. His testimony has been previously outlined in this opinion.

. . . .

Certainly, some of the information provided by the experts submitted by the petitioner could have been helpful in mitigation. While Pam Bigelow provided some information about the petitioner's past, much of the proof presented by petitioner at the post conviction hearing was not presented at the sentencing portion of his trial. Thus, the first two *Goad* factors weigh in petitioner's favor. However, the evidence of aggravating circumstances in petitioner's case was extremely strong. Thus, even if the testimony of Dr. Smith, Dr. Cheng and Professor Copper, and Dr. Kenner were presented, this Court finds petitioner still has not demonstrated that a reasonable probability exists that the jury would have concluded that the "balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069; see also Goad v. State, 938 S.W.2d at 371. Therefore, he is not entitled to relief on the basis of this claim.

As we have set out, the record supports these determinations.

## I. Ineffective Assistance of Counsel at the Penalty Phase

The petitioner argues that trial counsel were ineffective in mitigation proof in that they

did not develop a coherent sentencing strategy; did not locate and interview the petitioner's stepfather, James Ronald Powers; investigate the petitioner's early childhood in Taiwan; retain experts to assist in proof of mitigation; or object to the jury instruction as to reasonable doubt.

The post-conviction court determined that the petitioner had failed to show he was prejudiced because counsel had not located his stepfather:

> With regard to the testimony presented by petitioner's step-father and his step-father's sister, this court finds that, even if counsel should have presented this testimony during the sentencing portion of petitioner's trial, petitioner has failed to demonstrate he was prejudiced by counsel's conduct.
>
> Wanda Getz testified that her brother was married to the petitioner's mother. She stated that there was some tension between her family and petitioner's mother. She also testified that petitioner's mother had trouble speaking English; but, stated petitioner's English was good. Petitioner's step-father, James Powers, testified that he met the petitioner's mother while stationed in Taiwan. He stated that, at the time, petitioner's mother was working as a "bar girl" in Taipei. He indicated that the petitioner's family had a very poor existence in Taiwan. Powers stated that it was difficult for petitioner to leave his family in Taiwan, especially his grandmother and indicated that petitioner's relationship with his mother was strained. He testified that Cindy Powers was strict and would sometimes hit or whip the petitioner. He also stated that Cindy Powers enjoyed gambling and would often participate in the activity. Finally, Powers testified that some of the petitioner's uncles drank excessively.
>
> This court finds Getz['] testimony is of little value. Arguably Powers' testimony could have been helpful in preparing petitioner's mitigation case. [Lead counsel] testified that the defense team anticipated the petitioner's mother would testify and provide many of the same details. However, he stated that at the last minute she refused to participate in petitioner's trial. Regardless, given the strength of the aggravating circumstances in petitioner's case, this court cannot find that, even if counsel were deficient in failing to present this evidence during the sentencing phase of petitioner's trial, petitioner was prejudiced by their inaction. Thus, petitioner is not entitled to relief on the basis of this claim.

As to counsel's not requesting funds to retain a psychologist, an addiction specialist,

and an expert in Chinese, the post-conviction court determined that counsel had not been ineffective:

> [P]etitioner asserts counsel w[ere] aware that he had substance abuse problems, was a compulsive gambler, has low self-esteem, and was removed from his native Taiwanese culture at the age of ten; yet, counsel failed to secure the services of a culture and language expert; expert in addiction; and a psychologist or psychiatrist to assist them in preparing and presenting mitigation evidence at the sentencing phase of petitioner's trial and failed to present testimony from such experts to explain the effect such issues may have had on his actions. Petitioner contends had counsel retained the assistance of such experts they would have been able to present considerably more mitigation evidence than was presented at the sentencing portion of his trial. He argues that such mitigation would have outweighed the evidence in support of the aggravating circumstances presented by the State.
>
> . . . .
>
> This Court finds counsel did not have sufficient proof to demonstrate a particularized need for the services of Professor Co[p]per, Dr. Cheng or as previously discussed Dr. Kenner. While this Court finds there may have been sufficient evidence available to support a request for the services of a specialist in addictions, this Court finds that, at the time, trial courts were not inclined to grant such funds. Moreover, trial counsel testified that the defense team discussed presenting evidence of petitioner's addiction and determined that the risk of presenting such proof outweighed the benefits, especially in light of the fact that the only evidence supporting this assertion [was] records from petitioner's past incarceration.
>
> Finally, this court finds that even if [counsel] were ineffective in this regard, petitioner has failed to demonstrate he was prejudiced by counsel's inaction. When a petitioner challenges a death sentence based on ineffective assistance of counsel in the penalty phase, he or she must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069. Where the alleged prejudice involves counsel's failure to present sufficient mitigating evidence, several factors are of significance: (1) the nature and extent of the mitigating evidence that was available but not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the

-48-

guilt or penalty phase of the proceedings; and (3) whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. Goad v. State, 938 S.W.3d at 371.

The record supports this determination.

### III. Jury Instruction on Reasonable Doubt

The petitioner contends that the trial court erred in its instruction as to "reasonable doubt." The trial court instructed the jury:

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case, and an inability after such investigation to let the mind rest easily as to the certainty of your verdict.

Reasonable doubt does not mean a doubt that may arise from possibility.

Absolute certainty is not demanded by the law, but moral certainty is required, and this is required as to every proposition of proof requisite to constitute the offense of the verdict.

The petitioner argues that this instruction differs both from the reasonable doubt instruction and its alternative in the Tennessee Pattern Jury Instructions. See T.P.I.-Crim. 203, 203(a). According to the petitioner, trial counsel were ineffective in not objecting to this instruction, which, in his view, violated his right to due process. The State responds that this claim is waived, because it was not set out in the petition for post-conviction relief and, thus, was not considered by the post-conviction court. We agree with this argument that the claim is waived.

### IV. Alleged State Misconduct as to Evidence

The petitioner argues that he was prejudiced because the State suppressed exculpatory evidence and lost other evidence.

### A. Failure to Provide Exculpatory Evidence

The petitioner argues that the State should have provided a copy of the videotape of the hypnosis of Anna Dillon, arguing that the tape was favorable and exculpatory, that the State suppressed the tape, and that it was material to the defense. The State responds that the petitioner failed to show that the statement of Anna Dillon was ever reduced to a writing in

the possession of the State or that it was material.

According to the petitioner, Dillon made several exculpatory statements while under hypnosis, such as describing the perpetrator's car as "kind of a medium to dark gray," and saying later that it "could be a navy blue or a gray. It's a darkish color. Not light." Additionally, she described the perpetrator as "a white person with dark hair . . . dark curly hair but short" and said that he had "a straight nose." The petitioner states that, at the time of the offenses, he had a burgundy car and that he is Asian, with dark hair. The defense argues that disclosure of this tape to the jurors would have created reasonable doubt as to at least one juror and may have led them to question Dillon's statements.

The State makes several arguments in response. According to the State, the record does not show that the State suppressed the hypnosis tape; that the statements of Dillon, while under hypnosis, were not as credible as her trial testimony; and that they were not material.

The post-conviction court found that this claim was without merit:

This Court finds that the tape of the hypnosis interview was not known to the State at the time of trial and was not in the custody of state law enforcement officials. [The] Assistant District Attorney . . . stated that she had never seen the tape prior to preparing to testify in this post conviction proceeding. It appears from the testimony at the post conviction hearing, from the motions filed by post conviction counsel relating to this tape, and from the transcript of the tape itself, that this interview was not conducted pursuant to a request by either state or federal law enforcement officials; but, rather was conducted by a privately hired investigation firm. Thus, this Court does not find that the State improperly suppressed this information. Moreover, the materiality of this proof is questionable. Finally, even excluding Dillon's testimony, the other proof introduced against petitioner at trial was great. Thus, this Court finds petitioner is not entitled to relief on the basis of this claim.

The record supports this determination.


### B. Whether the State Breached its Duty to Preserve Evidence

The petitioner argues that a police property room employee testified that several items stored in the property room could not be located, including a comforter spread, a Rohm handgun, hair samples, a spent bullet, a cloth seat sample, miscellaneous gun paraphernalia, a blood sample, and miscellaneous residue.

We note that, unlike in State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), in which our supreme court concluded that a defendant's right to a fair trial could be violated by the negligent loss or destruction of evidence, the items in questions were available at the trial. Their destruction or loss did not occur until after the petitioner's conviction. We agree with the State that we cannot presume that these items, which the defense did not utilize at the trial, were exculpatory. The holding in Ferguson is not helpful to the petitioner's argument in this regard, which we conclude is without merit.

## V. Motion to Disqualify Post-Conviction Court

During the evidentiary hearing in this matter, post-conviction counsel filed a motion to disqualify the post-conviction court, asserting that the court "failed to diligently and fairly listen to the proof presented," was not attentive during the testimony of Dr. Murray Smith, and made comments raising a question as to the court's impartiality. Additionally, the petitioner asserts that, during an in-chambers discussion with the court on February 3, 2009, "the court expressed her bias and hostility towards both [the petitioner] and his post-conviction proceeding and her frustration with having to sit through the remainder of the testimony."

The State responds that the petitioner's allegations regarding bias do "not suggest that the judge made improper rulings, had a subjective bias against the petitioner, or lacked the ability to render an impartial decision in the case."

The post-conviction court denied the motion:

> This Court does not find that a reasonable person could even question this Court's impartiality under the circumstances. To transfer this case would create further delay in a case that has already had considerable delay. This Court has consistently tried to move this case forward and a portion of the proof has already been presented.

> This Court has given every effort to make this case move forward in a timely and reasonable manner. Therefore, given this Court does not find its impartiality could reasonably be questioned the Court finds that this case should move forward at this time.

We agree with the post-conviction court that the record does not reflect that the court made biased rulings against the petitioner. The situation presented by this matter would not require automatic recusal pursuant to Tennessee Supreme Court Rule 10, Canon 3E, and the court concluded that it was not prejudiced against the petitioner. The record supports this

determination.

## VI. Effect on Appeal of Counsel's Failure to Object to
## Applicability of Tennessee Code Annotated Section 39-13-204(c)

The petitioner argues that trial "[c]ounsel were ineffective in failing to object to the applicability of the 1998 amendment to Tenn. Code Ann. § 39-13-204(c) in the sentencing phase of [his] trial, thereby giving the 'green light' to the trial court to admit evidence of the facts underlying [his] prior convictions." The State responds that the petitioner has failed to show prejudice as to this claim.

On the direct appeal of this matter, our supreme court determined that the trial court had erred in its application of the 1998 amendment because the offense had been committed prior to the effective date of the amendment. Applying a plain error analysis, the court concluded that the error was harmless because the evidence was admissible to support the (i)(6) aggravating circumstances and did not affect the sentencing. Powers, 101 S.W.3d at 401-02. The post-conviction court concluded that any error by counsel in this regard was harmless:

> Petitioner asserts counsel should have objected to the applicability of the 1998 amendment to Tennessee Code Annotated § 39-13-204 at the sentencing portion of his trial. He contends counsel's failure to raise this objection led to the admission of "excessive" factual details underlying his prior convictions. Based upon the Tennessee Supreme Court's decision on direct appeal of petitioner's conviction and sentence, this Court finds counsel were ineffective in failing to object to the procedure employed by the trial court in submitting the underlying facts of his prior convictions to the jury. See State v. Powers, No. W1999-02348-SC-DDT-DD, 2002 Tenn. LEXIS 768, at *41 (filed January 6, 2002). However, since the Tennessee Supreme Court determined that the evidence presented in support of the prior violent felony aggravating circumstances was also admissible to show the petitioner committed the Sanderson murder in order to avoid arrest and prosecution, the Court found any error in admitting such proof was harmless. Id. at 45. Thus, even though this Court has found counsel w[ere] ineffective, petitioner has failed to demonstrate he was prejudiced by trial counsel's inaction.

We agree with the post-conviction court that the petitioner failed to establish prejudice as to this claim. The proof of aggravating circumstances was strong and that of mitigating circumstances was weak.

## VII. Death Penalty Claims

The petitioner argues that imposition of the death penalty violates various provisions of both the United States and Tennessee Constitutions. He asserts that it violates his right to equal protection of the laws, that it amounts to cruel and inhuman punishment, that it infringes upon his fundamental right to life, that the indictment returned against him was unconstitutional in that the aggravating factor was neither in the indictment nor returned by the grand jury, and that his conviction and death sentence violate international law and the supremacy clause of the United States Constitution. To the extent that these claims were raised on direct appeal, they have been previously determined. Tenn. Code Ann. § 40-30-106(h) (2010); State v. Suttles, 30 S.W.3d 252 (Tenn. 2000). Additionally, these challenges previously have been rejected by our supreme court. See State v. Hester, 324 S.W.3d 1 (Tenn. 2010); State v. Schmeiderer, 319 S.W.3d 607 (Tenn. 2010); State v. Kiser, 284 S.W.3d 227 (Tenn. 2009); Nichols, 90 S.W.3d at 604; State v. Dellinger, 79 S.W.3d 459 (Tenn. 2002). The chancery court held that Tennessee's revised lethal injection protocol is constitutional. See Stephen Michael West & Billy Ray Irick v. Derrick D. Schofield, Tenn. Comm'r of Corr., No. 10-1675-I (Davidson Chanc. Ct. Mar. 2, 2011) (Order). Moreover, we are bound on the record before us to our supreme court's holding on this issue. See Kiser, 284 S.W.3d at 275-76 (rejecting a challenge to the constitutionality of Tennessee's lethal injection protocol).

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the denial of this petition.

_____
ALAN E. GLENN, JUDGE